*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-AA-1031

**FILED 10/18/2018**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

NEIGHBORS FOR RESPONSIVE GOVERNMENT, LLC, ET AL.,
PETITIONERS,

V.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT,
RESPONDENT,

and

DISTRICT OF COLUMBIA DEPARTMENT OF GENERAL SERVICES,
INTERVENOR.

On Petition for Review of an Order of the
District of Columbia Board of Zoning Adjustment
(BZA App. No. 19450)

(Argued March 29, 2018                    Decided  October 18, 2018)

*David W. Brown* for petitioner.

*Richard S. Love*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Acting Solicitor General at the time the brief was filed, and *Stacy L. Anderson*, Senior Assistant Attorney General, were on the brief, for respondent.

*Meridith Moldenhauer*, with whom *Samantha Mazo* and *Eric J. DeBear* were on the brief, for intervenor.

Before BLACKBURNE-RIGSBY, *Chief Judge*, GLICKMAN, *Associate Judge*, and FERREN, *Senior Judge*.

GLICKMAN, *Associate Judge*: In the Homeless Shelter Replacement Act of 2016, the Council authorized the Mayor to build new emergency homeless shelters at specified locations in seven of the city's eight wards, including one fifty-family shelter on a large, city-owned tract on Idaho Avenue in Ward 3. Over some neighborhood opposition, the Board of Zoning Adjustment (the "BZA" or the "Board") granted zoning relief requested by the Department of General Services ("DGS") to enable it to build the proposed Ward 3 shelter as the District Government envisioned it. In this court, petitioners, a group of area residents led by Neighbors for Responsive Government (collectively referred to hereinafter as "NRG"), challenge the Board's decision to grant (1) a special exception allowing the Ward 3 shelter to provide temporary housing for up to fifty homeless families, and (2) area variances allowing the shelter to share the lot with the Metropolitan Police Department's Second District headquarters and to exceed height limitations in the residential zone. We affirm the Board's decision as being supported by substantial evidence in the record and otherwise in accordance with law.

## I. Background

The Homeless Services Reform Act of 2005[1] requires the District of Columbia Government to provide emergency shelter and a comprehensive "continuum" of other services to homeless individuals and families in the District of Columbia.[2] The Reform Act created an Interagency Council on Homelessness to lead the development of strategies and programs to alleviate homelessness in the District.[3] In 2015, the Interagency Council issued "Homeward DC," a five-year strategic plan to prevent and end homelessness based on nationwide experience and research and the identification of best practices in confronting homelessness.

A principal recommendation of Homeward DC related to the District's main emergency shelter for families experiencing temporary homelessness. Since 2007, following the closing of D.C. Village (where a former nursing home was utilized as a shelter for want of anything better), the District has provided emergency

---

[1] *See* D.C. Code §§ 4-751 to 4-756 (2012 Repl. and 2018 Cum. Supp.). Unless otherwise noted, references to provisions of the Homeless Services Reform Act in this opinion are to the 2005 enactment with its subsequent amendments, as set forth in the District of Columbia Official Code 2012 Repl. and 2018 Cum. Supp.

[2] *See* D.C. Code § 4-753.01.

[3] *See* D.C. Code § 4-752.01.

housing to homeless families at what was formerly the D.C. General Hospital. The hospital was not designed for this use, and the placement of the homeless shelter there was intended just to be a temporary stopgap measure until the District could provide suitable arrangements elsewhere. By 2015, however, the D.C. General Family Shelter was still operating, supplying emergency housing for 250 to 300 homeless families at a time under generally unsatisfactory conditions. Homeward DC called for replacing the facility by the 2019-2020 hypothermia season with several smaller, community-based shelters that would provide a full range of supportive services to families in safer and more dignified environments than could be maintained at D.C. General.

In anticipation of receiving a plan from the Mayor to implement this recommendation, the Council amended the Homeless Services Reform Act to establish minimum design standards for new shelters and require the Mayor to "maintain within the District's shelter inventory a minimum of 280 D.C. General Family Shelter replacement units."[4]

---

[4] D.C. Law 21-75, the Interim Eligibility and Minimum Shelter Standards Amendment Act of 2015, § 2 (b), 63 D.C. Reg. 257 (eff. Feb. 27, 2016). In 2018, the required number of D.C. General Family Shelter replacement units was reduced to 270 by D.C. Law 22-65, § 2 (b), 65 D.C. Reg. 331 (eff. Feb. 28, 2018). *See* D.C. Code § 4-753.01 (d)(5).

In 2016, the Council of the District of Columbia took up a plan submitted by the Mayor to close the D.C. General Family Shelter and construct new shelter facilities for homeless families in accordance with the recommendations of Homeward DC and the recent legislation. The Council was receptive to the plan. As the Committee of the Whole stated in its report on what became the Homeless Shelter Replacement Act of 2016, there was "widespread agreement that D.C. General [did] not meet the needs of families experiencing homelessness and should be closed."[5] New, "more humane" family shelter arrangements were urgently needed because, the Committee report explained,

> The problems with D.C. General as a shelter are myriad. It currently shelters nearly 300 families. The size of this facility has proven difficult to manage. Moreover, the building is old and outdated with basic systems that work poorly and are costly to maintain, including its heating, cooling, electrical, and water systems. In addition, the facility has been reported to be infested with pests and vermin. Also, outbreaks of scabies and reports of filthy communal bathrooms have been made. Further, reports of drug dealing and fights in and around the facility are rampant.[6]

---

[5] D.C. Council, Report of the Committee of the Whole on Bill 21-620, "Homeless Shelter Replacement Act of 2016," at 2 (May 17, 2016) [hereinafter Committee Report].

[6] *Id.* at 4. In subsequent testimony before the BZA in this case, Laura Green Zeilinger, the Director of the District of Columbia Department of Human Services

*(continued…)*

To replace the residential units that would be lost with the closing of the D.C. General Family Shelter, the Mayor proposed the construction of smaller and better-managed family shelters containing a total of 272 residential units providing emergency short-term housing at specified sites in six of the District's eight wards – Wards 3, 4, 5, 6, 7, and 8. The plan also contemplated a seventh family shelter in Ward 1 to replace another, smaller shelter located on Spring Road in Northwest D.C. (No site for a shelter was identified in Ward 2.) Equitable distribution of homeless shelters among the several wards of the city was a key goal of the plan for several reasons. In addition to eliminating disparities in the location of shelter capacity and demonstrating what DHS Director Zeilinger called "a citywide sense of solidarity" with families experiencing homelessness, spreading the shelters

---

*(...continued)*
("DHS"), explained how the sheer size of the D.C. General shelter was detrimental to the welfare of the homeless families residing there:

> We have seen time and time again, . . . and now with DC General, that large facilities or campuses congregating hundreds of our families simply do not work. Generally, these types of facilities are inefficient, chaotic and often do little to alleviate the trauma families experience upon becoming homeless. . . . The unpredictability that comes with sharing space with so many people can exacerbate trauma and necessitates exceedingly strict controls to maintain safety. These factors produce an environment that can lead to toxic stress, and have lasting negative impacts on the healthy development of children and the well-being of the family as a whole.

throughout the District is deemed optimal for the families themselves because it facilitates better shelter environments and encourages the families' participation in community life. It also is considered helpful in avoiding the "creation of large concentrations of poverty in just a few wards."[7]

Under the Mayor's plan, the new shelters would be designed to meet the recently adopted statutory requirements and have comprehensive on-site support services of the kind required by the Homeless Services Reform Act.[8] The projected size of the shelters reflected a balance between the need to deliver these services efficiently and cost-effectively and the need to avoid the size-related problems encountered at D.C. General. To create safe, quiet, family friendly environments and avoid the overcrowding, security, and managerial problems that

---

[7] *Id.* at 5.

[8] *See* D.C. Code § 4-753.01 (describing the "comprehensive range of services" to be made available to assist homeless individuals and families to overcome the barriers they face to obtaining and maintaining permanent housing). As DHS Director Zeilinger explained in her BZA testimony, homeless families "have better outcomes . . . when services and supports are co-located in the emergency shelter buildings." Therefore, the shelters would need to include such services as "permanent housing programs, housing search assistance, credit counseling and budgeting" assistance, and other social work support and age-appropriate programs for all generations.

plagued the facility at D.C. General, each proposed new shelter would have no more than 50 residential units in total.

The proposed sites for the shelters were selected by DGS.[9] In their testimony before the BZA in this case, the Director of DGS and the City Administrator described how the sites were identified and evaluated under a range of relevant criteria developed with DHS. DGS started by looking for sites in its inventory of city-owned properties. In most of the wards, it did not identify suitable government property that it considered to be available. DGS then engaged a real estate broker to assist in finding appropriate sites in those wards and conducted a public solicitation for offers of privately-owned properties throughout the city that could be developed to meet the criteria for shelters.[10] Based on this investigation and DGS's evaluation of the potential alternative properties, the Mayor's plan proposed that the District would lease five of the seven new shelters

[9] DGS is a subordinate agency within the executive branch. Its functions include "manag[ing] the capital improvement and construction program for District government facilities" and "acquir[ing] real property, by purchase or lease, for use by the District government." D.C. Code § 10-551.01 (b)(1), (2) (2012 Repl.).

[10] Although the public solicitation proposed that the District would enter into ground leases at a rental rate "reflective of the competitive market value" of the property, the witnesses testified that the search for suitable sites for the new homeless shelters extended to properties that the District might purchase.

– those in Wards 1, 3, 4, 5, and 6 – from private developers rather than own them outright.

The Council held an all-day public hearing on the plan on March 17, 2016, at which it heard from over 80 witnesses. There was broad support for closing the D.C. General Family Shelter and replacing it with smaller, service-oriented facilities located across the city. Many witnesses, however, questioned the proposed financial arrangements and the selection of sites for the new family shelters, among other aspects of the plan. At the hearing, and subsequently, the Council received and considered suggestions for alternative sites. With the assistance of a real estate valuation and consulting firm, the Council analyzed the proposed plan's financial structure.

Ultimately, the Council endorsed the Mayor's general approach by enacting the Homeless Shelter Replacement Act of 2016 (hereinafter, the "HSRA").[11] Agreeing that homeless "children and families do best when short-term housing is provided in smaller-scale, service-enriched, community-based settings," the Council found it "in the best interest of the District" to construct new shelters,

_____

[11] D.C. Law 21-141, 63 D.C. Reg. 8453 (eff. July 29, 2016) [hereinafter HSRA].

located in Wards 1, 3, 4, 5, 6, 7, and 8, that would be "safe and dignified spaces for families experiencing homelessness."[12] Five of the six new shelters authorized by the Act as replacements for the D.C. General Family Shelter, including the one in Ward 3, were each to contain approximately 50 family residential units in order to meet the statutory target of 280 replacement units in total.[13]

In two critical respects, however, the Council chose to alter the plan submitted by the Mayor. The Council found the leases proposed for five of the new shelters to be financially disadvantageous to the District; its real estate consulting firm advised that "most of the proposed [lease] deals [were] above-market and that purchase of each site would be more cost-effective, rather than the District spending over $265 million" in rent payments over the lease terms.[14] Moreover, the Council was concerned that the eventual expiration of the leases would disrupt the District's provision of services to homeless families and that city ownership of the shelter sites would provide desirable "permanency to the shelter

---

[12] HSRA § 2 (4), (6).

[13] HSRA § 3. Space constraints affecting the District-owned property selected as the site for the Ward 7 shelter limited its size to 35 replacement units.

[14] Committee Report at 8.

plan."[15] To reduce the overall cost "dramatically" and avoid the risk of disruption, the Council decided that all of the new shelter facilities should be on District-owned land.[16]

In addition, the Council rejected three of the sites proposed by the Mayor and selected alternative sites in each case. One of these site changes was for the new family shelter in Ward 3. The Mayor's proposed site in Ward 3 was at 2619 Wisconsin Avenue, N.W. This was not city-owned property, nor did the Mayor's plan foresee its acquisition by the District. Rather, the Mayor's plan envisioned that the District would enter into a lease with a private developer of the property for a term of 15 years with a five-year renewal option at an annual rent starting at $2,066,400 and increasing by 3% each year.[17] The Council's real estate consultant determined that the proposed rental rate was "above market by approximately

[15] *Id.*

[16] *Id.* at 14; HSRA § 2 (7).

[17] Committee Report at 7, 9. According to the BZA testimony of DGS Director Greer Gillis, DGS received proposals for six privately-owned Ward 3 sites in response to its solicitation, and the site at 2619 Wisconsin Avenue was the only one of adequate size, within close proximity to public transportation, and having the capacity to satisfy program requirements.

$366,400 per year" and that the terms of the deal would result in a "windfall" profit for the property owner or landlord.[18]

Councilmembers proceeded to consider suggested alternative sites in Ward 3.[19] The Council assessed the suitability of these sites in light of several criteria. These included whether the District owned or could acquire the property; whether the lot was large enough for the planned shelters; accessibility of public transportation, services, and amenities; economic feasibility; and whether the District could develop the site within the target timeframe of 24 to 30 months.[20] The Council concluded that the best available site for the homeless family shelter in Ward 3 was at 3320 Idaho Avenue, N.W.[21] Chairman Mendelson testified that there were several reasons for this conclusion. Because the District already owned the Idaho Avenue site (unlike the other Ward 3 sites under consideration), there

---

[18] *Id.* at 9.

[19] As identified in testimony submitted to the BZA in this case by Phil Mendelson, Chairman of the Council of the District of Columbia, the alternative Ward 3 locations examined by the Council included a former diplomatic residence at 3101 Albemarle Street, a vacant church at 4100 River Road, and 3320 Idaho Avenue. Fort Reno also was suggested but, according to Chairman Mendelson, it was believed to be unavailable.

[20] Committee Report at 11.

[21] DHS Director Zeilinger testified that this site had been proposed by Advisory Neighborhood Commission representatives.

would be no acquisition-related delays and costs, and the Council believed it would be the least expensive site to develop. Although the Metropolitan Police Department ("MPD") Second District headquarters was situated on the Idaho Avenue property, that still was the largest site available and was fully capable of supporting a shelter for up to 50 families on the unoccupied portion of the space.[22] It was near public transportation and other amenities.[23]

Thus, the Committee Report declared, the new legislation would "direct[]" the Mayor to utilize the site at 3320 Idaho Avenue and other sites owned by the District in what the Council viewed as "a clear plan for how the District will replace D.C. General."[24] Putting that plan into action, the Council "authorized" the Mayor in the HSRA to use funds specially appropriated for "capital project

---

[22] Although DGS previously had considered 3320 Idaho Avenue, it had not proposed it because it had assumed that placing the shelter there would necessitate relocating the police station from the site. The Council apparently did not share DGS's assumption that the Second District headquarters would need to be relocated.

[23] Regarding the other two sites considered by the Council, DGS advised that it had been unable to complete a successful negotiation for the former diplomatic residence on Albemarle Street, and that the River Road site had not been offered when DGS had conducted its open solicitation for suitable properties. DGS informed the Council that it considered neither site suitable "within [its] allotted budget and timeframe."

[24] Committee Report at 3, 14.

HSW03C – Ward 3 Shelter" to construct a "temporary shelter for families experiencing homelessness containing up to 50 D.C. General Family Shelter replacement units on District-owned land at 3320 Idaho Avenue, N.W., Square 1818, Lot 849."[25] Other provisions of the HSRA similarly authorized the Mayor to construct shelters at specified locations in the other wards. Any use of the appropriated funds "inconsistent" with these authorizations is expressly prohibited.[26]

In deciding where to place the several new shelters, the Council acknowledged that there would be "vigorous community opposition to the various proposed shelter locations."[27] Nonetheless, the Councilmembers unanimously agreed that the plan to meet the needs of families experiencing homelessness through the development of smaller, service-enriched shelters in each of the wards was "the best approach" and in the public interest.[28] The Council believed the HSRA represented "a strong statement of the District's commitment to making homelessness rare, brief, and non-recurring and that doing the right thing can be

---

[25] HSRA § 3 (a)(2).

[26] *Id.* § 3 (e).

[27] Committee Report at 12.

[28] *Id.* at 5.

done in a manner that is both an effective and efficient use of the District's financial resources and capital assets."[29]

The Council recognized the likelihood that the projects authorized in the HSRA, including the Ward 3 shelter at Idaho Avenue, would require zoning relief from the BZA. It declined to declare its support for unspecified zoning relief in advance, especially without knowing the particular issues that the BZA would face. However, the Council expressed the belief that the revisions to the Mayor's proposed legislation had strengthened the case for zoning relief by furthering the public interest:

> To the extent that public purpose is a mitigating factor in the consideration of zoning relief, the Committee [of the Whole] asserts that there is a difference whether the shelters are publicly or privately owned. Public shelters to house homeless families is a public benefit. This benefit is enhanced if there is no private profit associated with it. The Committee's requirement that the shelters be owned, not leased, by the government is helpful to the need for zoning relief.[30]

---

[29] *Id.* at 3.

[30] *Id.* at 13.

## II. Application to the BZA for Zoning Relief

The city-owned property chosen by the Council for the Ward 3 emergency shelter for homeless families is a roughly rectangular, 200,965 square foot lot located one block off Wisconsin Avenue on the southwest corner of the intersection of Idaho Avenue and Newark Street in the Northwest quadrant of the District of Columbia. The MPD's Second District headquarters are in a three-story building which sits in the northern portion of the lot and fronts on Idaho Avenue. A refueling station for police and other official vehicles is in the northwest corner of the property, and a police parking lot and an impoundment lot are situated in the area west and south of the police building. On the west side, nearly half of the parcel is used for community gardens, a play area, and tennis courts. A brick wall or fence, up to ten feet in height, extending from Newark Street and then east toward Idaho Avenue, separates the police parking lot from the community gardens and adjoining residential area to the south.

DGS and its architecture firm developed a plan to build the Ward 3 homeless family shelter in the southern portion of the Idaho Avenue parcel, north of the brick fence, on part of the parking lot. As finalized, the plan provides for the shelter to have 50 family residential units (with a capacity of approximately 185

beds) on five floors of a six-story, 69-foot-tall building.[31]   The ground floor is reserved for support services, dining and recreational areas, and administrative offices.  The shelter is to be set back 63 feet from the lot's southern boundary line, on the other side of which are single-family dwellings, and 25 feet from Idaho Avenue on the east.  It will be opposite a planned unit development on the other side of Idaho Avenue containing three-to-five story buildings (including two apartment buildings, other residential structures, a supermarket, other retail stores, and offices).   To the north, across Newark Street, are McLean Gardens, a development of three- and four-story apartment buildings; a five-story building housing a radio station; and a nine-story apartment building with retail uses on the ground floor.

The Idaho Avenue site is located in an area with a Residential Apartment ("RA") zoning classification, RA-1.   RA zones "permit urban residential development and compatible institutional and semi-public buildings."[32]   RA-1 zoning is appropriate for areas "predominantly developed with low- to moderate-

---

[31]   The shelter building initially was proposed to be somewhat taller, but the plans were revised to lower its height in response to concerns expressed by the local Advisory Neighborhood Commission and others.

[32]   11 DCMR Subtitle F § 100.1 (2016).

density development."[33]    Generally speaking, "all types of urban residential development," including emergency homeless shelters, are permitted in an RA-1 zone provided they conform to applicable height, density, and area requirements.[34] A shelter for more than four persons in an RA zone, however, requires BZA approval as a special exception.[35]   In addition, without a variance granted by the BZA, the zoning regulations allow no more than one primary structure to be built on each lot in an RA zone,[36] and they limit the maximum building height permitted as of right in an RA-1 zone to 40 feet and three stories.[37]

For these and other reasons not relevant here, DGS applied to the BZA for special exception and variance relief on January 3, 2017.[38]    Petitioner NRG, representing a group of persons residing near the subject property, was granted party status to oppose the application.    The local Advisory Neighborhood

---

[33] *Id.* § 300.2.

[34] *Id.* § 300.1 (a); *see* 11 DCMR Subtitle U § 420.1 (f) (2016).

[35] *See* 11 DCMR Subtitle U § 420.1 (f) (2016).

[36] 11 DCMR Subtitle C § 302.2.

[37] 11 DCMR Subtitle F § 303.1.

[38] DGS sought (and was granted) certain additional zoning relief that we do not discuss in this opinion because it is not contested on appeal.

Commission, ANC 3C, also was a party to the proceeding. The ANC supported DGS's requests for a special exception permitting the emergency shelter use and a variance allowing the shelter to be a second primary structure on the lot, but it opposed the request for a height variance.

The Office of Planning ("OP") submitted a report recommending approval of DGS's application in its entirety.[39] The MPD Second District (which would continue to occupy part of the Idaho Avenue site if the Ward 3 shelter were placed there) and other interested city departments and agencies, informed the BZA that they either supported or did not object to the requested zoning relief. Ward 3 Councilmember Mary Cheh submitted a letter in support. Neighborhood residents were divided; the BZA received letters supporting or opposing the requested zoning relief from numerous individuals residing near the proposed project.

The BZA held a hearing on DGS's application on March 1, 2017, at which the witnesses supporting the application included DHS Director Laura Green Zeilinger, who testified on the design of the shelter and as an expert on matters

---

[39] The District of Columbia Office of Planning is charged with reviewing and commenting on all zoning cases, and the BZA and the Zoning Commission are directed to give "great weight" to its recommendations. D.C. Code § 6-623.04 (2018 Repl.).

relating to homelessness; DGS Director Greer Gillis, who testified to the site selection process and other matters relating to the shelter plan; Rashad M. Young, the City Administrator of the District of Columbia and Chair of the Interagency Council on Homelessness; Phil Mendelson, the Chairman of the Council, who testified about the Council's decision to locate the Ward 3 shelter on the Idaho Avenue property and related matters; Joseph McNamara, the project architect; and Nicole White, DGS's transportation and traffic expert.[40] NRG presented six area residents who opposed the application; NRG did not present any expert witnesses. An ANC Commissioner also testified regarding the ANC's views.

On August 30, 2017, the BZA issued a 37-page Decision and Order granting DGS's requests for zoning relief. As discussed in greater detail below, the BZA found that DGS had satisfied the applicable conditions for approval of the proposed 50-unit, 185-bed emergency shelter use as a special exception and for area variances allowing the shelter to be the second primary structure on the lot and to exceed the height permitted in an RA-1 zone as of right. NRG filed a timely petition for this court to review each of those decisions.

---

[40] Other witnesses who testified in favor of the application included a member of the Interagency Council design committee and a neighbor and architect who supported the proposed height of the shelter.

## III. Discussion

Our review of a BZA decision to grant zoning relief is subject to the usual limitations on appellate review of agency action in a contested case.[41] "We will not reverse the BZA's decision unless its findings and conclusions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of its jurisdiction or authority; or unsupported by substantial evidence in the record of the proceedings . . . ."[42] On questions relating to the interpretation of the zoning regulations, our review is deferential; the BZA's interpretation "must be upheld unless it is plainly erroneous or inconsistent with the regulations."[43] And we will not reweigh the evidence; "[i]f there is substantial evidence to support the Board's finding, then the mere existence of substantial evidence contrary to that finding does not allow this court to substitute its judgment for that of the Board."[44]

---

[41]   *See* D.C. Code § 2-510 (2012 Repl.).

[42]   *Metropole Condo. Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 141 A.3d 1079, 1082 (D.C. 2016) (internal brackets and quotation marks omitted) (quoting *Economides v. District of Columbia Bd. of Zoning Adjustment*, 954 A.2d 427, 433 (D.C. 2008)).

[43]   *Id.* (internal quotation marks omitted) (quoting *Oakland Condo. v. District of Columbia Bd. of Zoning Adjustment*, 22 A.3d 748, 752 (D.C. 2011)).

[44]   *Brown v. District of Columbia Bd. of Zoning Adjustment*, 486 A.2d 37, 52 (D.C. 1984) (en banc) (internal quotation marks omitted) (quoting *Spevak v.*
(continued…)

## A. The Special Exception

### 1. The Determinations of the BZA

The BZA is empowered by law to grant requests for "special exceptions" allowing uses or construction not permitted as of right in a given zone.[45] The pertinent requirements are set forth in the zoning regulations in 11 DCMR Subtitle U § 420.1 (f) and Subtitle X § 901.2. Section 420.1 (f) provides that to secure special exception approval of an emergency shelter in an RA zone for 5 to 25 persons, an applicant must establish (1) that the shelter will have "adequate, appropriately located, and screened off-street parking to provide for the needs of occupants, employees, and visitors to the facility"; and (2) that the shelter will "not have an adverse impact on the neighborhood because of traffic, noise, operations, or the number of similar facilities in the area."[46] The regulation further provides that the BZA may approve an emergency shelter facility in an RA zone for more

---

*(…continued)*
*District of Columbia Alcoholic Beverage Control Bd.*, 407 A.2d 549, 554 (D.C. 1979)).

[45] *See* D.C. Code § 6-641.07 (g)(2) (2018 Repl.).

[46] 11 DCMR Subtitle U § 420.1 (f)(2), (4). An emergency shelter in an RA zone for fewer than 5 persons does not require special exception approval.

than 25 persons (with no upper limit specified) if it finds (3) that "the program goals and objectives of the District of Columbia cannot be achieved by a facility of a smaller size at the subject location and [that] there is no other reasonable alternative to meet the program needs of that area of the District."[47] Under § 901.2, which sets forth generally applicable special exception review standards, the applicant must show that the special exception will "be in harmony with the general purpose and intent of the Zoning Regulations and Zoning Maps" and "not tend to affect adversely[] the use of neighboring property in accordance with" those Regulations and Maps.[48]

The BZA determined that DGS met these conditions. It credited the testimony of DGS's traffic expert and other witnesses and agreed with the conclusions of the OP and the District Department of Transportation ("DDOT") that the proposed emergency shelter will not generate a significant demand for parking.[49] Accordingly, the BZA found the parking condition of § 420.1 (f) will be

---

[47] *Id.* § 420.1 (f)(6). Other conditions set forth in § 420.1 (f) are not applicable in this case.

[48] 11 DCMR Subtitle X § 901.2; *see* D.C. Code § 6-641.07 (g)(2).

[49] As the BZA found,

*(continued…)*

satisfied by DGS's plan to construct a new, two-story parking garage containing approximately 239 parking spaces on three levels for use by both the shelter and the police. The garage, which can be built without the need for approval of any zoning relief, will replace all the police parking lot spaces lost due to the construction of the shelter. In addition, as a response to community concerns, it will provide additional spots to eliminate overflow parking of police cars on surrounding neighborhood streets. (The police impoundment lot is to be relocated off-site.) The garage will be located "very near" the shelter, "a considerable distance from any neighboring dwelling," and it will be shielded from the view of nearby residents by the police station and plantings creating a "green screen wall."

---

*(...continued)*

Based on the Applicant's experience at other emergency shelters, very few residents will have personal vehicles (and in fact more than half of the residents are likely to be young children). All the residents will receive transit subsidies to encourage use of public transportation, and the number of employees [staffing the Ward 3 shelter] will be relatively small, generally 10 to 22 employees, with a maximum of 27 during shift changes. The use of personal vehicles is not necessary for convenient access to the site, since the location is well-served by public transportation and conveniently located near car- and bicycle-sharing facilities, and the shelter building will provide both short-term and long-term bicycle storage.

The BZA also found that the proposed Ward 3 shelter, which "will be the only such facility in the vicinity," will not have "an adverse impact" on the neighborhood. For many of the same reasons that it found the facility will not generate a significant demand for parking, the Board agreed with the DDOT that traffic impacts on the surrounding area also will be "minimal."[50] Further, based on expert testimony and other evidence presented by DGS regarding the planned operations and activities of the shelter, the BZA found:

> The emergency shelter use is not likely to generate any adverse impacts relating to noise or operations. Operation of the emergency shelter will be supervised by staff who will be on-site 24 hours each day.[51] All

---

[50] Among other things, the Board credited the testimony that "most shelter residents likely will not travel to the site by personal vehicle"; the shelter would be "staffed by a relatively small number of employees who will work in shifts on a schedule that will not coincide with peak traffic periods on nearby streets"; and trash pick-up and meal deliveries would be limited and adequately accommodated by the "internal circulation of the site" and designated trash collection and loading spaces.

[51] The testimony established, and the Board found, that "[a]t least 10 employees will be on-site at all times, and as many as 27 could be at the facility during shift changes." To maintain order and safety, among other reasons, the ten residential units on each residential floor of the shelter (floors two through six) will be "accessed by a single central corridor," and "[s]taff monitors will be stationed at the east end of each residential floor in a location providing a line of sight encompassing the elevators and the entire length of the corridor." In addition, as DHS Director Zeilinger testified,

> [R]esidents will have limited access to other floors. They will only be issued keys for their particular floor. . . .

*(continued…)*

operations will be contained within the building with the exception of the small play area, which will be located on the western edge of the property adjacent to an area of community gardens. Trash storage and pickup will occur on the northern side of the building, at a considerable distance from the nearest neighboring residences.[52] Operation of the emergency shelter use will be guided by a "good neighbor agreement" devised by a community advisory team that will conduct ongoing discussions to address any concerns about the emergency shelter that may arise in the future.[53]

---

*(…continued)*

[T]his reinforces the goal of security and predictability of environment for the families by ensuring [that] only persons residing on the floor may access the floor. . . . With a security desk on each floor 24 hours per day, staff will be present to monitor activities and common areas in the hallway and ensure that only persons who are living on a floor are actually on the floor.

[52]  The BZA noted that DGS altered its plan so as to move the playground and trash pickup area to these locations at the ANC's suggestion, in order to reduce the noise impact by increasing their distance from any residences. The playground "will be bordered by the planned parking garage and the existing brick fence."

[53]  The "good neighbor agreement" is a formal, binding agreement between the shelter operator and DGS, on the one hand, and a representative community body (the "community advisory team"). As the BZA explained:

A "community advisory team" was formed as part of the Mayor's community engagement process . . . . The Ward 3 community advisory team will conduct "ongoing discussions about specific concerns" with respect to the emergency shelter and will "provide feedback on concerns related to resident quality of life during construction and help develop" a "good neighbor agreement" for the program. The good-neighbor

*(continued…)*

In addition, the BZA noted, the MPD Second District stated that the shelter will not interfere with its operations or its ability to protect the public, and other District of Columbia agencies, such as the Fire and Emergency Medical Services Department, likewise had no objections to the shelter.

The BZA addressed the concerns of the ANC and NRG about the visual and privacy impacts of a tall, "high-density" structure on the adjoining residential uses in a low- to moderate-density zone. Based on a "shadow study" submitted by DGS, the Board found that "[t]he new construction will not create any shadow impacts on nearby residences, since all shadows cast by the shelter building will remain within the boundaries of the subject property." Relying on the OP's and the project architect's testimony, the Board also found that the height and size of the proposed shelter will not raise "any issues of light and air" or threaten the privacy of neighboring homes. It based this finding on "the size of the subject

*(…continued)*

> agreement, between the service provider of the emergency shelter and the advisory team on behalf of the community, will address expectations and commitments regarding exterior facility and landscape maintenance, community safety, neighborhood codes of conduct, and communication, problem-solving, and mutual respect.

DGS indicated that the good neighbor agreement would be in place and binding on it prior to the issuance of a certificate of occupancy for the shelter.

property; the front, side, and rear yard setbacks that will be provided so that the new building will be located a significant distance from any other building aside from the MPD headquarters; and the continued compliance of the subject property with applicable area restrictions including lot occupancy after the new construction is completed."[54]  Responding to a letter from the U.S. Commission of Fine Arts, the BZA found that the proposed shelter will not be "too tall for its context" either, given the larger buildings that are located nearby.[55]  The BZA concluded that "the proposed density is appropriate at the site, considering especially the public need

---

[54]  The project architect also testified that trees planted between the shelter and the residences to the south would provide privacy from the shelter, and that the distance of the shelter from other properties, made possible by the lot's great size, and the slope of the terrain would limit any potential damage to residents' sightlines.

[55]  In a February 24, 2017, letter to DGS, the U.S. Commission of Fine Arts commented on DGS's concept designs for the family shelters in Wards 3, 5, and 6. Regarding the Ward 3 design for a six-story building at 3320 Idaho Avenue, the Commission stated:

> The Commission members commented that the new building would act as a transitional structure between single-family houses and adjacent blocks of larger institutional buildings, and they agreed that a multi-family project here could be sympathetic with the context of the neighborhood.  However, while they found that the massing of the program could reasonably be accommodated on the site, they observed that the programmatic ideal of ten families per floor has resulted in a design that is too tall for its immediate context of single-family houses and a low-rise police station.

for the facility and the lack of adverse impacts associated with the emergency shelter on the use of neighboring property."

Next, the BZA found that the District's program goals and objectives could not be achieved by a smaller facility at the Idaho Avenue property, and that no other reasonable alternative would meet the program needs of that area of the District. The Board discussed this question at length and identified several reasons for its conclusion. First, it found that the 50-unit size of the Ward 3 shelter was necessitated by the District's decision to close the D.C. General Family Shelter and maintain a total of 280 replacement units in several shelters distributed among the wards. Second, based on the testimony of DHS Director Zeilinger and others, the BZA found that the need to provide 50 residential units in the Ward 3 shelter also was "driven by program needs" and the necessity of providing statutorily-mandated support services to homeless families efficiently and cost-effectively.[56] The Board credited testimony from Director Zeilinger, DGS Director Gillis, and the project architect that the alternative of building smaller shelters "would require

---

[56] As found by the BZA, a key part of the District's program for homeless individuals and families is the provision of a suite of "wrap-around" services to assist them in obtaining permanent housing more quickly. The services "are intended to provide connections to permanent housing programs, housing search assistance, credit counseling, and budgeting, as well as to offer assistance in meeting needs such as childcare, health care, training, and employment services."

the operation of multiple programs, with significantly higher annual operating costs than a single 50-unit shelter,"[57] and "would also 'extend the timeline' by years until sufficient Replacement Units would become available to allow the closure of the D.C. General family shelter." This, the BZA noted, would thwart the District's "critically important" goals of closing D.C. General by the 2019-2020 hypothermia season and "provid[ing] suitable shelter for families who are experiencing homelessness."

---

[57] For example, Director Zeilinger testified,

> When we operate, we have to have a full compl[e]ment of staff at each program. So the question had come up during the [C]ouncil process . . . why wouldn't the [D]istrict just have a smaller building . . . and have more of them? And that would practically double our operations' costs[;] that would require we have on-site facility maintenance at every program[,] on[-]site 24-hour security, and security on each floor of the building, as well as for the building as a whole. We have program staff at each site and . . . social workers, people who do housing assessments and a range of other services and supports that address the needs of all members of the family. So . . . not only would we have to [s]ite and construct an entire additional building, but we would also have increased operating costs to operate more sites. . . . And we would have to have an additional service provider, additional contract for any operations there that would encompass those supportive services that I just described to you. We would also do additional meal delivery at each . . . location, you know, all the operations' costs. And so the right economy of scale we believe to achieve is up to 50.

Third, the BZA found that the proposed height and number of floors, configuration, and other "specific design elements" of the Ward 3 shelter were derived from the minimum legal requirements for residential units and support services embodied in the Homeless Services Reform Act and from the District's "research and experience"-based program goals of providing a safe, peaceful, and supportive living environment. This was "especially" so, the BZA said, with respect to "the maximum of 10 sleeping units per floor and the provision of only a single hallway on each floor, so that the entire length is visible to staff, to enhance the residents' security."[58] The Board was "persuaded that the maximum of 10 units per floor is an institutional necessity." Similarly, "[t]he Board credit[ed] the

---

[58] Director Zeilinger testified that "10 units or less per floor" on a single, "straight hallway" were among the "key design guidelines" followed in the planning to avoid recreating the sprawling and unsuitable character of the D.C. General Family Shelter in the smaller emergency shelters that would replace it. She explained:

> Research has shown that limiting the number of families per floor to ten or fewer allows families to have more privacy, less noise, less turbulence in the hallways, a more predictable environment and an appropriate community feel. Also, a maximum of 10 units per floor is ideal to allow families to provide the proper amount of attention to young children, who[], as we all know have a great deal of energy. This scale also permits the common rooms on each floor to feel more like community living rooms than anonymous cafeterias or auditoriums. . . .

*(continued…)*

Applicant's testimony about the need to offer inviting areas on the ground floor for the provision of services, the unsuitability of the basement, even if it could be expanded cost-effectively,[59] as a location for the wrap-around services, and the inability to lower building height without creating interior spaces with inappropriately low ceiling heights." Thus, the Board concluded, the proposals for reducing the height of the shelter were "not feasible" in view of their cost and "because they would not achieve all of the program needs faced by the Applicant, including the need to provide an adequate number of Replacement Units while

---

*(…continued)*

> Each floor will ideally be designed to have a direct line of sight down the floor's single central hallway. This choice is intentional to keep personal safety at the forefront of the building plan by removing corner hiding places. This allows the program operator to ensure safety while also mitigating the need for other more intrusive-feeling security measures.

The Board also heard and credited the project architect's testimony that alternative designs, such as a three-story, two-wing structure (which the ANC had recommended), would require a larger footprint for the building that would "probably exceed the limits of the south portion of the site" and have structural consequences making it considerably more costly to build than the proposed six-story, single-wing structure.

[59] Consideration had been given to reducing the height of the proposed shelter building by excavating and putting in a full basement floor, but DGS Director Gillis explained that doing so would add "several million dollars" to the cost.

achieving a suitable environment in a secure location for residents, also considering the costs of providing the necessary services."

Fourth, considering the prolonged site selection process that led to the Council's choice of the Idaho Avenue property for the Ward 3 shelter, the BZA concluded that DGS had shown there is no reasonable alternative to the proposed Ward 3 shelter that would meet the program needs of that area of the District. The BZA found no justification for requiring DGS to search any further; nor would it "second guess" the program needs identified by experts at the Interagency Council on Homelessness and the Department of Human Services, "as those needs and the best way to meet them in a cost-effective manner are outside the scope of the Board's expertise in zoning."

In addition to finding that DGS had met the special conditions applicable to emergency shelters in RA zones, the BZA approved the special exception as meeting the generally applicable requirements of § 901.2. The BZA found the special exception to be "in harmony with the RA-1 Zone and its purposes to permit flexibility of design in urban residential development and the construction of institutional and semi-public buildings compatible with adjoining residential uses"; that although the RA-1 Zone is designed to be mapped in "areas *predominantly*

developed with low- to moderate-density development, [it] anticipates some higher density development as well"; and that the height of the proposed Ward 3 shelter would not be incompatible with the RA-1 Zone mapping, "especially considering the mix of uses and building types in the immediate vicinity."[60] The Board also mentioned that buildings are permitted to be up to 90 feet tall in RA zones, as a matter of right, provided they are set back sufficiently from each lot line.[61] Although the proposed Ward 3 shelter is not set back far enough to meet the as-of-right conditions, this allowance confirmed the Board's view that the 69-foot-tall shelter, set back to the extent it will be, "will not substantially impair the intent, purpose, or integrity of the RA-1 Zone."

## 2. NRG's Contentions Regarding the Special Exception Approval

NRG contends that regardless of how it is designed, a shelter large enough to provide emergency housing for as many as 185 occupants at a time is too large to be eligible for special exception approval. So large a shelter, NRG asserts,

---

[60] The project architect provided photographic evidence showing the proposed shelter in the context of surrounding buildings to demonstrate that "the six-story emergency shelter is not out of character with this area" and would have minimal visual impact on the adjacent properties.

[61] *See* 11 DCMR Subtitle F §§ 203.3, 203.4.

cannot be found to be "in harmony with the general purpose and intent" of an RA-1 Zone, as required by 11 DCMR Subtitle X § 901.2 (a), and is "simply beyond any reasonable outer limit for special exception approval under [Subtitle] U § 420.1 (f)." More specifically, NRG claims the conditions of § 420.1 (f)(6) were not met because DGS failed to prove that the District's needs could not be achieved by either a facility housing fewer homeless families at Idaho Avenue or a 50-family shelter at a reasonable alternative site. For several reasons, we reject these sweeping claims.

First, the requirements for special exception approval in the cited zoning regulations impose no *per se* limit on the maximum size of an emergency shelter in an RA-1 Zone. As the BZA recognized, an increase in population density is not "necessarily incompatible" with a residential neighborhood; rather, compatibility turns on whether it would have an adverse impact on the neighborhood in terms of traffic, noise, or other effects.[62] Although RA-1 Zones are "*predominantly*

---

[62] *See Clerics of St. Viator, Inc. v. District of Columbia Bd. of Zoning Adjustment*, 320 A.2d 291, 295 (D.C. 1974) (holding that BZA erred in relying on projected increase in population density to deny zoning relief for conversion of a seminary building to a nursing home, where "[t]he Board did not find that the increase in density would adversely affect the neighborhood and it does not necessarily follow from the findings that the increase in density in this case is necessarily incompatible with a residential neighborhood").

developed with low- to moderate-density development," that does not mean higher density development is completely prohibited in them. Rather, the BZA *must* approve a proposed shelter as a special exception, regardless of the shelter's size, if it finds that the express conditions in the regulations are met.[63]

Second, we doubt that the BZA's authority in considering an application for zoning relief extends to second-guessing the Council's legislative determination of the District's needs and the appropriate measures to meet them. The HSRA authorizes the Mayor to use appropriated funds to construct a 50-unit family shelter on the city's property at 3320 Idaho Avenue. Construction of a smaller shelter, or at a different site, is proscribed by the Act's explicit prohibition against any inconsistent use of the appropriated funds. The Council's intentions could not be clearer. As it stated in its report on the HSRA, it chose to "direct[]" the Mayor to build a 50-family shelter on the Idaho Avenue site.[64] There and nowhere else; the Council rejected other options as not being in the public interest. While there may be limitations on the Council's authority to enact "regulations . . . inconsistent

---

[63] *See Stewart v. District of Columbia Bd. of Zoning Adjustment*, 305 A.2d 516, 518 (D.C. 1973).

[64] Committee Report at 14.

with" the zoning regulations,[65] we do not see that the BZA is empowered to override such a legislative enactment based on its disagreement with the Council's assessment of the public need for a 50-family shelter or the unacceptability of alternative locations.[66]

Third, as recounted above, substantial evidence supported the BZA's findings that the Ward 3 shelter needed to be capable of providing emergency housing and support services for up to 50 homeless families in order to achieve the District's program goals and objectives of replacing the D.C. General Family Shelter with efficient, cost-effective, and well-managed facilities in Ward 3 and the other wards. The BZA could credit DGS's expert testimony that smaller shelters would entail higher operating and construction costs.[67] NRG argues that the smaller (35-family) size of the Ward 7 replacement shelter contradicts this finding. We disagree; while more space apparently was not available in Ward 7, that fact

---

[65] D.C. Code § 6-641.10 (2018 Repl.).

[66] *See id.* § 6-641.07 (g) (granting specific, limited powers to the BZA).

[67] *See Shay v. District of Columbia Bd. of Zoning Adjustment*, 334 A.2d 175, 178 n.10 (D.C. 1975) ("While agencies are not always bound to accept expert testimony over lay testimony, the opinions of qualified experts are not to be lightly disregarded. . . .") (internal citation omitted).

only heightened the need for the other five replacement shelters to meet the 50-family target.

Fourth, while NRG argues that DGS and the Council did not conduct "a reasonable and systematic effort" to locate a suitable alternative site for the Ward 3 shelter, there is substantial evidence in the record that they did. As the testimony established, DGS initially looked at city-owned properties. It then initiated a public solicitation for offers of other properties to lease, based on criteria developed by the DHS. The Council, dissatisfied with DGS's results and concluding that leases would not be in the District's best interest, expanded the search. Both bodies identified possible alternatives in the Ward, evaluated them, and rejected them for economic or other reasons. No evidence was presented of a reasonable alternative site that was not considered. Under these circumstances, the BZA had a sufficient evidentiary basis for finding there was no reasonable alternative to the Idaho Avenue site that would meet the needs of Ward 3 for a 50-unit family shelter.

Fifth, although NRG challenges the BZA's findings that the Ward 3 shelter will not have an adverse impact on its residential neighbors, we conclude that there was sufficient evidentiary support for the findings. NRG asserts that "[c]ommon

sense says . . . shoe-horning 50 families with children of all ages onto a small footprint . . . will add significant noise to this quiet neighborhood and will alter its low-density character."[68]   It believes that the on-site staff and good neighbor agreements will not prevent noise from being a problem.  But the BZA was entitled to credit the testimony of witnesses such as DHS Director Zeilinger that these and other measures (such as DGS's relocation of the shelter's playground and trash storage to reduce their noise impact) would be effective, even if NRG disagrees. Similarly, NRG also complains that the proposed shelter is too tall and "will loom over . . . all of the nearby single-family homes, depriving them of their privacy, and reducing their sunlight, air and sight-lines."[69]   But as previously mentioned, the BZA found this complaint unwarranted, relying on evidence that included a "shadow study" and the testimony of the project architect and the OP that the shelter would not overwhelm the neighboring homes because it would be substantially set back and buffered from them.  Even though these were matters in

---

[68]   Br. for Pet'rs at 43.

[69]   *Id.* at 36.   NRG faults the BZA for not according "deference" to the comments of the U.S. Commission of Fine Arts that the proposed shelter will be "too tall for its immediate context of single-family houses and a low-rise police station."   See *supra*, footnote 55.   The BZA was not required to accept the Commission's opinion and it adequately explained why it did not do so.

dispute, with testimony on both sides, the BZA had substantial evidentiary support for its findings. We therefore cannot overturn them.

Finally, NRG argues that the BZA could not find that the "adequate, appropriately located, and screened off-street parking" requirement of § 420.1 (f)(2) was satisfied because DGS did not provide sufficiently detailed architectural plans of the proposed parking garage. The zoning regulations provide that applicants for approval of a special exception or variance shall submit, among other materials, "[a]rchitectural plans . . . in sufficient detail to clearly illustrate any proposed structure . . . and, where applicable, parking and loading plans."[70] It may be unclear whether this requirement applies to a structure, such as the garage in this case, that does not itself require special exception or variance relief to be built at the site in question. The BZA did not agree with NRG's claim that DGS's application for zoning relief was incomplete without architectural drawings for the garage. In any event, however, DGS furnished other documentation, plans, and contextual images of the proposed parking structure showing its relationship to the existing MPD building and the nearby community gardens, as well as plans for the "green wall" to be placed on the western side of the garage. NRG does not

---

[70] 11 DCMR Subtitle Y § 300.8.

demonstrate that the BZA erred in relying on this material (in addition to the OP and DDOT input and DGS's traffic consultant testimony) in concluding that the garage would supply adequate, appropriately located, and screened off-street parking. The architectural drawings would seem to have little if any bearing on these matters.

## B. Variance Relief

### 1. The Determinations of the BZA

The BZA is empowered by law to grant variance relief from the "strict application" of the zoning regulations when specified conditions are met.[71] One of the conditions differs depending on how the variance is classified. The regulations classify variances as either "area variances" or "use variances." The distinction is an old one, drawn from case law in this and other jurisdictions. As we discuss more fully below, an area variance is "a request to deviate from an area requirement applicable to the zone district in which the property is located,"[72]

---

[71] *See* D.C. Code § 6-641.07 (g)(3).

[72] 11 DCMR Subtitle X § 1001.2.

while a use variance is one that seeks permission for a use that is not permitted in the zone district where the property is located.[73]

The BZA determined that the variances requested by DGS to erect a second primary structure on a single record lot in an RA zone, and to exceed the building height and number of stories permitted as of right in an RA-1 Zone, are area variances. The BZA may grant an area variance where (1) by reason of an "extraordinary or exceptional" condition affecting the property, (2) strict application of the zoning regulations would result in "peculiar and exceptional practical difficulties" for the property's owner, and (3) variance relief from those difficulties can be granted "without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan."[74] Our cases discussing the first of these requirements have said that the

---

[73] *Id.* § 1001.4.

[74] D.C. Code § 6-641.07 (g)(3); *see, e.g.*, *Ait-Ghezala v. District of Columbia Bd. of Zoning Adjustment*, 148 A.3d 1211, 1216 (D.C. 2016); *Gilmartin v. District of Columbia Bd. of Zoning Adjustment*, 579 A.2d 1164, 1167 (D.C. 1990). The same test must be met to obtain a use variance, except that the applicant for a use variance must show that strict enforcement of the zoning regulations will entail a greater degree of harm (the second of the three conditions), referred to in the statute as an "undue hardship." *See Gilmartin*, 579 A.2d at 1170 ("[B]ecause of the nature of the respective types of variances and their effects on the zone plan the higher 'undue hardship' standard applies to requests for use

*(continued…)*

extraordinary or exceptional condition must pertain to the specific property rather than to the neighborhood in general, but that it need not inhere in the land itself and may arise from "a confluence" of factors.[75] We also have said that to satisfy the second, "practical difficulties" requirement, the property owner need only demonstrate that compliance with the area restriction would be "unnecessarily burdensome" and that the difficulties are unique to the particular property.[76] In determining whether this requirement is met, it is proper for the BZA to consider a "wide range of factors," including (but not limited to) economic use of property and increased expense and inconvenience to the applicant.[77]

Our cases also have recognized that "public need for the use" to be served by a variance is "an important factor" in determining whether it should be

---

*(…continued)*
variances while the lower 'practical difficulty' standard applies to area variances.").

[75] *Gilmartin*, 579 A.2d at 1168; *see also Palmer v. Board of Zoning Adjustment*, 287 A.2d 535, 539 (D.C. 1972) ("To support a variance, it is fundamental that the difficulties or hardship be due to unique circumstances peculiar to the applicant's property, and not to general conditions in the neighborhood.").

[76] *Gilmartin*, 579 A.2d at 1170; *see also Fleischman v. District of Columbia Bd. of Zoning Adjustment*, 27 A.3d 554, 561-62 (D.C. 2011).

[77] *Gilmartin*, 579 A.2d at 1170-71.

granted.[78]  The BZA therefore can be "more flexible" in applying the three-part test

for a variance when the applicant is a non-profit organization (rather than a for-

profit entity), especially where the organization is seeking the zoning relief in order

to meet a public need or serve the public interest.[79]  In *Monaco*, for example, we

concluded that "when a public service has inadequate facilities and applies for a

variance to expand into an adjacent area in common ownership which has long

been regarded as part of the same site, then the Board of Zoning Adjustment does

not err in considering the needs of the organization as possible other extraordinary

and exceptional situation[s] or condition[s] of a particular piece of property."[80]  A

non-profit organization may be granted an area variance to meet a public need or

serve the public interest if it shows "(1) that the specific design it wants to build

---

[78]  *Monaco v. District of Columbia Bd. of Zoning Adjustment*, 407 A.2d 1091, 1098 (D.C. 1979); *see also, e.g.*, *Williams v. District of Columbia Bd. of Zoning Adjustment*, 535 A.2d 910, 911 n.2 (D.C. 1988) ("We have previously recognized that important public interest concerns, as well as potential hardship to the public, are properly considered as factors in BZA determinations of variance relief. . . .  As part of this analysis, the BZA may also consider potential hardship to the public if the variance is not granted.").

[79]  *Monaco*, 407 A.2d at 1098; *see also St. Mary's Episcopal Church v. District of Columbia Zoning Comm'n*, 174 A.3d 260, 269-70 (D.C. 2017); *Draude v. District of Columbia Bd. of Zoning Adjustment*, 582 A.2d 949, 956 (D.C. 1990); *Nat. Black Child Dev. Inst., Inc. ("NBCDI") v. District of Columbia Bd. of Zoning Adjustment*, 483 A.2d 687, 690 (D.C. 1984).

[80]  *Monaco*, 407 A.2d at 1099 (internal quotations omitted) (quoting D.C. Code § 6-641.07 (g)(3)).

constitutes an institutional necessity, not merely the most desired of various options, and (2) precisely how the needed design features require the specific variance sought."[81]

Applying these principles, the BZA concluded that DGS had satisfied the three requirements for the area variance relief it sought. Regarding the first requirement (the existence of an extraordinary or exceptional condition affecting the property), the BZA noted that it "may consider the property owner's needs in finding an exceptional situation or condition when the applicant is a non-profit organization and the proposed use is a public service."[82] Understanding DGS to be a non-profit organization, the BZA found that

> [T]he subject property is faced with an exceptional situation and condition especially as the result of the designation of the lot as the site for the Ward 3 emergency shelter. The Applicant has shown that the District has a need to use the subject property in

---

[81] *Draude v. District of Columbia Bd. of Zoning Adjustment*, 527 A.2d 1242, 1256 (D.C. 1987).

[82] "The characterization of a proposed use as a public service is significant," the BZA stated, and (reiterating the language of *Monaco* quoted above), "when a public service has inadequate facilities and applies for a variance to expand . . . , then the Board of Zoning Adjustment does not err in considering the needs of the organization as possible other extraordinary and exceptional situation or condition of a particular piece of property." (Internal quotation marks omitted.)

furtherance of providing a public service, the provision of shelter and services to homeless families. The site is "uniquely valuable" to the Applicant in light of the goals and policies set forth in the Homeward DC initiative, and is "uniquely suitable" as the location for the proposed emergency shelter in light of the site selection process undertaken by District agencies and finally voted on by the Council.

The Board also noted that this court has previously upheld decisions in which the Board granted a variance to a "nonprofit entity whose work promoted the public welfare . . . when, absent variance relief, 'the great expense of operating offices at another site would cause serious detriment' to the nonprofit."[83] The Board "accept[ed]" the Council's site determination, as it was based on relevant criteria and made after an unsuccessful search for reasonable alternatives, and found that the Idaho Avenue lot "is the only site within Ward 3 that could be used."[84]

Second, based essentially on the same evidence and reasons supporting its special exception findings that the District's goals and needs could not be met in other ways, the BZA found that strict application of the zoning regulations would result in unnecessarily burdensome practical difficulties for the District. "A

---

[83] Quoting *NBCDI*, 483 A.2d at 690.

[84] "For the District to have not gone forward with the site approved, but instead analyzed the feasibility of other sites in Ward 3, would have been an exercise in futility," the Board added.

building limited to the height and number of stories permitted as a matter of right," the Board found, "would be unnecessarily burdensome to the Applicant by preventing its implementation of a design derived from extensive research and consideration of operational efficiencies and the costs of providing the necessary services."[85] The Board also was persuaded that strict application of the one-primary-structure-per-lot regulation would be unnecessarily burdensome for the District, as there was no practical way for DGS to comply with the regulation and

---

[85] Reiterating its special exception analysis, the Board stated:

> The Applicant demonstrated a need for the proposed building height, as a lower building with multiple wings or the operation of several small facilities at multiple locations would complicate the provision of services while greatly increasing the costs, and would not comport with the District's policy decisions with respect to the optimal size and layout of emergency shelter facilities. The Board finds that the six-story height, with each floor providing an adequate floor-to-ceiling height, is an institutional necessity with respect to the construction of an emergency shelter for families that will meet statutory requirements with respect to the provision of private rooms, adequate bathroom facilities, and suitable space to offer wrap-around services while also meeting security requirements and achieving cost efficiencies in the operation of the shelter.

still construct an emergency shelter at the site.[86]

Third, again echoing its special exception determinations, the BZA found that the variances will not be detrimental to the public good or the zone plan because the lot is large enough to accommodate the shelter and the police station along with the accessory uses without overcrowding or violation of applicable lot occupancy and floor area limits or side yard and rear yard requirements; and because there already are buildings of similar or greater height to the north and east of the lot, and the Ward 3 shelter building will be "substantially set back and

---

[86] The Board discussed possible alternatives and found them wanting. It stated:

> The need for variance relief to allow another principal structure could be avoided if the Applicant undertook to subdivide the lot, but the Applicant has argued persuasively that delays in the development of the new shelter would hinder the provision of needed services and unnecessarily drive up the costs of the project. The need for the variance could also be avoided if the new construction were undertaken as an addition to the existing primary structure [the Second District police headquarters building]; a meaningful connection between the two structures would render them one building for zoning purposes. However, the connection of two structures devoted to two very different uses would create operational difficulties for both the emergency shelter and, likely, the MPD facility.

buffered from adjacent streets and residences and would therefore not overwhelm the nearby lower scale buildings."

## 2. NRG's Contentions Regarding the Variances

NRG attacks the variances on several grounds, beginning with a challenge to the BZA's finding that the Idaho Avenue property is subject to an exceptional condition arising from the Council's designation of it for the Ward 3 emergency shelter. [87] NRG's argument is threefold. First, NRG asserts that the Board erred in applying the principle that it may be more flexible in evaluating a request for a variance and finding an exceptional condition when the applicant is a non-profit organization seeking the variance to enable it to serve a public need. NRG argues that the flexibility principle enunciated in *Monaco* and our subsequent case law is available only when a non-profit applicant seeks to expand or continue an existing, previously authorized use on its property or on adjacent property it also owns – not, NRG claims, when the applicant seeks to add "a new primary use to an

---

[87] NRG also claims the Board erroneously relied on the presence of the existing structure and uses on the lot (i.e., the police station and ancillary uses) as additional support for its exceptional condition finding. However, although the Board considered the existing improvements for other purposes, we do not read its opinion as relying on them as a reason to find an exceptional condition justifying the two variances at issue here.

existing use on the same property."[88]  Second, NRG contends that the BZA erred in relying on the HSRA designation of the Idaho Avenue property for the Ward 3 shelter because the Act did not override zoning requirements or mandate the use of the site for that purpose.  As NRG puts it, the HSRA gave DGS the right to apply to the BZA for zoning relief but did not compel the BZA to grant it.  Third, NRG asserts that the BZA should have denied the variances because the exceptional condition necessitating such relief was self-imposed, in that the District chose its already-occupied Idaho Avenue site instead of other possible locations even though it knew or should have known that the Ward 3 shelter could not be built on that site without variance relief.

These contentions do not persuade us.  We reject NRG's proposed limitation of the BZA's flexibility when it evaluates requests for variance relief to enable non-profit entities to serve an important public need or purpose.  The rationale for such flexibility, as stated in *Monaco*, is that the "public need for the use is an important factor in granting or denying a variance."[89]  On its face, this rationale is not limited to situations in which the applicant seeks only to expand or continue an

___

[88] Br. for Pet'rs at 27.  NRG does not dispute that DGS is a non-profit organization for purposes of our *Monaco* line of cases.

[89] *Monaco*, 407 A.2d at 1098.

existing, previously authorized use. It may be true that past decisions of this court involved situations of that sort.[90] None of them, however, purported to limit the BZA's permissible exercise of flexibility to only such situations. While the addition of a new use may raise greater concerns than the expansion of an existing use, we think those concerns are best addressed by other requirements for obtaining a variance – specifically, the requirement that there be no substantial detriment to the public good or the zone plan. Thus, we hold that when a non-profit organization applies for a variance as being necessary to enable it to meet a public need or serve the public interest without undue burden, the BZA has discretion to take the public benefit into account in assessing whether the requirements for a variance are met (including the existence of an exceptional condition affecting the property), regardless of whether the applicant seeks to

---

[90] NRG points to *Monaco*, in which the applicant was granted a variance to expand its offices into an adjacent area in common ownership, *id. at* 1099; and *NBCDI*, in which the applicant was granted a variance to continue a use after a zoning provision that had authorized it was eliminated by an amendment of the regulations, 483 A.2d at 689. *St Mary's Episcopal Church* appears to have gone beyond NRG's narrow interpretation of the *Monaco* line of cases, however. In *St. Mary's*, the Zoning Commission granted zoning relief allowing Hillel at George Washington University to demolish its existing campus religious building and erect a larger one in its place, in which new academic uses would be permitted in addition to the previous religious uses, 174 A.3d at 264, 267. Our opinion upholding the Commission's order cited its "correct reading and application of our case law, including *Monaco*, . . . which clearly stated that the Commission may be more flexible when it assesses a non-profit organization." *Id.* at 270 (internal quotation marks omitted).

expand or continue an existing, authorized use, or to add or substitute a new use of the property in question. Accordingly, we see no legal error in the Board's decision to apply the "flexible" public interest standard in this case in which the applicant, a non-profit (governmental) entity, seeks to add a new use to its property to meet a substantial public need for an emergency homeless shelter in the ward.

The Board was not under the impression that the HSRA overrode zoning requirements or compelled it to grant the variances that DGS sought; in its order the Board expressly recognized that the Council "did not (and could not) mandate the use of the subject property" for the Ward 3 shelter. But that does not mean the Council's designation of the Idaho Avenue site was immaterial to the question of whether the property was subject to an exceptional condition for purposes of granting the requested variances. As the Board explained, the Council's designation reflected a legislative determination, supported by substantial evidence, of a critical public need to utilize the site for the Ward 3 shelter because it is "uniquely valuable" and "uniquely suitable" for that purpose. The BZA properly considered that determination, not as overriding applicable zoning requirements, but in applying those requirements to the application at hand.

It is true that the District picked the Idaho Avenue site for the Ward 3 shelter with foreknowledge of its need for variance relief – a need that is due in part to the District's own earlier decision to construct the Second District police headquarters on a lot subject to a one-primary-structure zoning limitation. Thus, we think it may be fair to characterize the District's need for relief as self-imposed or self-created.[91] As the Board said, however, citing our decision in *Gilmartin*, "[p]rior knowledge or constructive knowledge or that the difficulty is self-imposed is not a bar to an area variance."[92] The Board found that the Idaho Avenue lot was the only site in Ward 3 that feasibly could be used for the shelter needed there. Much as NRG disagrees with that finding, it was supported by substantial evidence in the record, as we have explained above. The District therefore cannot be said to have deliberately preferred a site requiring variance relief over an acceptable alternative

---

[91] *See Foxhall Community Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 524 A.2d 759, 762 (D.C. 1987) ("[H]ardship is self-created if it is . . . caused by improvements to the land constructed by the applicant with knowledge of the restrictions from which he [or she] seeks relief." (Internal quotation marks omitted)).

[92] *See Gilmartin*, 579 A.2d at 1171 ("[P]rior knowledge or self-imposition of the difficulty did not bar granting an area variance. Rather, that fact was but one of many factors that BZA might consider in reaching its decision."); *cf. Ass'n for Preservation of 1700 Block of N Street, N.W. v. District of Columbia Bd. of Zoning Adjustment*, 384 A.2d 674, 678 (D.C. 1978) (explaining that although the applicant for variance relief purchased the property with full knowledge of the problems it would face, its "self-created hardship is not a factor to be considered in an application for an area variance, . . . as that factor applies only to a use variance.").

location that would not have needed such relief. [93]   The BZA therefore had the power to grant area variances to enable construction of the Ward 3 shelter on the Idaho Avenue property and did not abuse its discretion in doing so merely because the District chose the property knowing it would need the variances, or because the District can be said to have created its zoning difficulties by its own previous development of the property.

Next, NRG argues that the BZA erred in treating the variance from the one-primary-structure-per-lot regulation, 11 DCMR Subtitle C § 302.3, as only an area variance.  NRG contends the BZA should have recognized it as being a use variance.  The distinction between an area variance and a use variance matters in this case because a property owner need only show "practical difficulties" to obtain an area variance, whereas property owners must always show "undue hardship" to

---

[93] *See Ass'n for Preservation of 1700 Block of N Street, N.W.*, 384 A.2d at 678 n.13 (explaining that an area variance appropriately might be denied where "the owner of the property had two alternative methods of construction which would have *fully* complied with the zoning regulations, whereas here the [applicant] had no feasible alternative method" that would have met its needs).

obtain a use variance.[94]  In addition, a use variance will not be granted if the owner's hardship was self-created.[95]

The Board disagreed with NRG's characterization of the variance.  It determined that under the definitions contained in the zoning regulations, the requested relief was for an area variance, not for a use variance.  In reviewing that ruling, "our only task is to determine whether the Board's interpretation is plainly erroneous or inconsistent with the regulations."[96]  We undertake that task recognizing that the difference between the two types of variance is "one of degree," that some variances "resist easy classification," and that "[t]he determination of whether a variance is one of area, use, or something else, is not made easier, or more just, by resort to rigid typecasting for the purpose of establishing precedent in the law of zoning."[97]  This court has concluded that

---

[94] *See Palmer v. Board of Zoning Adjustment*, 287 A.2d 535, 540-541 (D.C. 1972).

[95] *See Foxhall Community Citizens Ass'n*, 524 A.2d at 761.

[96] *Taylor v. District of Columbia Bd. of Zoning Adjustment*, 308 A.2d 230, 232 (D.C. 1973).

[97] *Wolf v. District of Columbia Bd. of Zoning Adjustment*, 397 A.2d 936, 941 (D.C. 1979) (internal quotation marks and citation omitted) (quoting ANDERSON'S AMERICAN LAW OF ZONING, Vol. 3 § 18.46 (2d ed. 1977); *see also* RATHKOPF'S THE LAW OF ZONING AND PLANNING § 58:4 (2018).

"[d]eterminations with respect to the treatment and classification of proposed variances are best made . . . on an ad hoc basis, by the agency from whose regulations those variances are sought," and that "[j]udicial review with respect to those determinations is in general best made . . . under the well established rule of deference to administrative expertise."[98]

We are satisfied that the BZA construed its regulations reasonably. The zoning restriction at issue, 11 DCMR Subtitle C § 302.2, provides that "[e]ach new primary building and structure shall be erected on a separate lot of record in all . . . RA zones." This is a limitation on the location of new primary buildings or structures; it is not expressed as a limitation on the uses thereof.[99] The terms "use variance" and "area variance" are defined in 11 DCMR Subtitle X § 1001. A "use variance" is defined in § 1001.4 as a request to permit:

> (a) A use that is not permitted matter of right or special exception in the zone district where the property is located;
>
> (b) A use that is expressly prohibited in the zone district where the property is located; or

---

[98] *Wolf*, 397 A.2d at 942.

[99] A "use" is not the construction of a building but rather "[t]he purpose or activity for which a lot or building is occupied." 11 DCMR Subtitle B § 100.2.

(c) An expansion of a nonconforming use prohibited by Subtitle C § 204.

This is not an open-ended definition; to be a use variance, the permitted deviation from a zoning regulation must meet one of the foregoing three criteria. As the BZA said, the relief here – permission to erect an emergency shelter as a second primary structure on a lot in an RA-1 Zone – does not meet any of them. It does not fall within subsection (a) because an emergency shelter is a permitted matter of right or special exception use in an RA-1 Zone. It does not fall within subsection (b) because emergency shelter use is not "expressly prohibited" in the zone. And it does not fall within subsection (c) because the addition of an emergency shelter on the Idaho Avenue property would not be an expansion of any nonconforming use.

The relief *does* fall squarely within the definition of an "area variance," however. Unlike the definition of a use variance, the definition of an area variance is open-ended. Section 1001.2 states that "[a]n area variance is a request to deviate from an area requirement applicable to the zone district in which the property is located." The term "area requirement" is not defined, but § 1001.3 helpfully provides several "[e]xamples of area variances." They include "requests to deviate from . . . [r]equirements that affect the size, location, and placement of buildings and other structures . . . ." The one-primary-structure-per-lot restriction is, plainly,

a requirement affecting the "location" and the "placement" of structures, not their use, and the variance DGS requested was permission to deviate from that requirement. Hence the BZA could reasonably conclude that this was indeed an area variance within the meaning of the zoning regulations, and we defer to that conclusion.

Even so, NRG argues that the relief DGS obtained was comparable, given its impact on the zone, to what this court has called a "hybrid" or "use-area" variance – meaning the standards for use variances should still apply to it. NRG complains that the BZA failed to address this argument.

The zoning regulations recognize only area and use variances, however. They do not reference "hybrid" or "use-area" variances; nor are those terms to be found in the statute. It is not clear they ever have had legal significance. It is true that this court did use those terms to characterize variances at issue in two cases decided in the early 1970's. In *Palmer*, the first of those cases, the applicant sought a variance to provide a parking lot for its theater patrons. In dicta, and without explanation, the court commented that the variance did "not strictly fall into either category" (use or area variance) and characterized it as "a hybrid with

aspects of both."[100] The variance we now consider does "strictly fall" into the area variance category, however, and it is plainly excluded from the use variance category, as each of those categories is defined.[101]  *Taylor*, the second case, affirmed the denial of a variance that would have allowed the applicant to construct 27 row houses in a district zoned for detached single-family homes.  The court stated that, "while the requested variance may not be a use variance in its 'purest form,' it is a hybrid variance which would drastically alter the character of the zoned district" and therefore "might well be described as a use-area variance" and held to a higher standard (the undue hardship burden) than a pure area variance.[102]  In the present case, however, the variance requested is simply permission to build a second structure on an unusually large 200,000 square foot lot that already is

---

[100]  *Palmer*, 287 A.2d at 541.  The court found it "unnecessary to elaborate on this distinction" because the applicant "fail[ed] to meet either standard."  *Id.*

[101]  *Palmer* did not mention any definition of area (or use) variances in the zoning regulations, and its description of an "area variance" as merely one "relating to restrictions such as side yard, rear yard, frontage, setback or minimum lot requirements," *id.*, is not consonant with the broader definition of an area variance in 11 DCMR Subtitle X §§ 1001.2 and 1001.3.

[102]  *See Taylor*, 308 A.2d at 233.  Like *Palmer*, *Taylor* did not address itself to definitions of area and use variances in the zoning regulations.  It simply said that "in general, area variances involve minor alterations to the character of the zoned district while use variances tend to drastically change the district's nature."  *Id.*

occupied by a police station and ancillary uses, and the Board found that the addition will not alter the character of the neighborhood significantly.

After alluding to "hybrid" variances in *Palmer* and *Taylor*, the court declared in *Wolf* that "[t]he *Palmer* case represents as far as we choose to go in judicially defining area and use variance, or hybrids thereof."[103]  The court *rejected* the petitioner's contention in *Wolf* that an area variance granted by the BZA to convert a row house to accommodate three apartment units was "a hybrid of both a use and an area variance which under the law required a showing of both undue hardship *and* practical difficulties."[104]

We do not exclude the possibility that, in some cases, a variance request might seek a deviation from both a use restriction and an area restriction and, therefore, be subject to the preconditions for granting both a use variance and an area variance.  As we have seen, however, a variance from the one-primary-structure-per-lot restriction is not of this nature.  And we see no reason to invent a third "hybrid" category of variance that is unrecognized in the zoning regulations. Any concern that some area variances might "drastically" alter the character of the

---

[103]  *Wolf*, 397 A.2d at 941.

[104]  *Id.* at 942 (emphasis in original).

zoned district is addressed by the requirement that an applicant for a variance of any type must bear the burden of demonstrating that the variance will cause no substantial detriment to the public good and will not substantially impair the intent, purpose, and integrity of the zone plan.

We thus deem the "hybrid" concept inapplicable to the variances at issue in this case. The BZA therefore did not err in holding that the relief requested from the one-primary-structure-per-lot restriction was an area variance and not a use variance without bothering to address whether it could be a hypothetical and legally irrelevant "hybrid" variance.

As to the variance permitting DGS to construct a shelter exceeding the as-of-right limits on height and number of stories in an RA-1 Zone, there is no dispute that it is an area variance. NRG's remaining arguments against the grant of this variance repeat arguments it made that the special exception would adversely affect the neighborhood and conflict with the zone plan, and we reject them for the same reasons. In brief, while the evidence may have been in conflict, "the decision as to what testimony should be credited and given the most weight was within the

province of the BZA."[105] As recounted above, the record contains substantial evidence, furnished by DGS's witnesses and the OP among other sources, that a 69-foot-tall, six-story shelter will not be substantially detrimental to the neighbors or out of scale with the surrounding neighborhood. The BZA was entitled to accept that evidence.[106]

---

[105] *Dorchester Assocs. LLC v. District of Columbia Bd. of Zoning Adjustment*, 976 A.2d 200, 216 (D.C. 2009).

[106] As we have mentioned, the ANC, though it supported DGS in other respects, joined with NRG's opposition to the height-and-number-of-stories variance. The BZA is statutorily directed to give "great weight" to the "issues and concerns raised in the recommendations" of an ANC, which requires it to "articulate with particularity and precision the reasons why the [ANC] does or does not offer persuasive advice under the circumstances." D.C. Code § 1-309.10 (d)(3)(A)—(B) (2012 Repl.). The BZA "is not required to defer to the ANC's views," but it must respond to them adequately. *Levy v. District of Columbia Bd. of Zoning Adjustment*, 570 A.2d 739, 746 (D.C. 1990). In this case, we perceive that the BZA was assiduous in fulfilling its obligation to address the ANC's concerns, in particular with respect to the size of the proposed Ward 3 shelter.

In *supporting* the requested variance from the one-primary-structure-per-lot requirement, the ANC said it "believes strongly in the need for the city to develop a master site plan for the property," because "[c]o-locating two critical public uses on one lot raises potential concerns about compatibility." The ANC did not explain what it thought should be contained in a master site plan or what role it thought the BZA had in the process of establishing such a plan. For its part, the BZA acknowledged and generally addressed the ANC's articulated concerns relating to "the unusual proposal to co-locate the Ward 3 shelter with the Second District police station" and the compatibility of the two uses (discussing, for example, the MPD's support for the project and the new parking arrangements for the police). NRG points out that the BZA did not address specifically the ANC's recommendation that the city develop a master plan. As the ANC directed this recommendation to the city rather than to the BZA, and as the ANC did not

*(continued…)*

## IV. Conclusion

For the foregoing reasons, we affirm the Decision and Order of the BZA.

*So ordered.*

---

*(…continued)*
condition its endorsement of the variance on the development of a master site plan or the BZA's requirement of such a plan, we conclude that the BZA did not err in failing to address the recommendation.