FOXHALL COMMUNITY CITIZENS ASSOCIATION, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,

St. Patrick's Episcopal Church, Intervenor.

No. 85–1130.

District of Columbia Court of Appeals.

Argued March 12, 1986.
Decided April 27, 1987.

William A. Dobrovir, Washington, D.C., for petitioner.

Whayne S. Quin, with whom David S. Houston, Washington, D.C., was on the brief, for intervenor.

Before NEBEKER, NEWMAN and FERREN, Associate Judges.

FERREN, Associate Judge:

The Board of Zoning Adjustment (BZA) granted the application of the intervenor, St. Patrick's Episcopal Church, for a use variance. St. Patrick's requires the variance in order to sell its church at 1655 Foxhall Road, N.W. for conversion into 21 condominium apartments. Petitioner, the Foxhall Community Citizens Association, argues that St. Patrick's itself created the "exceptional and undue hardship" used to justify the variance and that such a self-imposed hardship cannot serve as a basis for a use variance. Because we agree with this argument, we reverse the BZA's order and remand for further proceedings, without need to reach petitioner's other contentions.[1]

I.

St. Patrick's filed an application for a variance from the use provisions of the R–3 Zone, 11 DCRR § 3103.3 (1982) (now set out at 11 DCMR § 320.3 (1986)), in order to permit conversion of its existing church building to 24 (later changed to 21) residential condominium apartment units.[2] The site is located at the southeast corner of the intersection of Reservoir Road and Foxhall Road, N.W., Lot 156 in square 1350. It has five sides; it is bounded by streets on the north, west, and south and by a public alley on the northeast and the southeast. A three story brick building stands on the property and, until recently,

1. Petitioner contends the church failed to prove the variance was necessary to assure a reasonable return on the property. Petitioner also argues the BZA failed to give "great weight" to the concern of Advisory Neighborhood Commission 3B, see D.C.Code § 1–261(d) (1981); Kopff v. District of Columbia Alcoholic Beverage Control Board, 381 A.2d 1372, 1383–85 (D.C.1977) (construing "great weight"), which had stressed that granting the variance would lead to further erosion of the single family character of the neighborhood in derogation of the zoning plan. Finally, petitioner had asserted a conflict of

interest but withdrew the charge after the Director of Campaign Finance of the Board of Elections and Ethics reviewed and resolved the matter.

2. St. Patrick's also requested area variances related to parking, pursuant to 11 DCRR §§ 7205.-11, 7205.122, 7206.7 (1982) (these provisions have subsequently been amended, and the current provisions appear at 11 DCMR § 2116 (1986)).

was used as a church with a number of outreach programs and a private school.

St. Patrick's decided to move after undertaking an in-depth, long-range planning study which concluded that the existing church building needed costly renovations, would require expensive continued maintenance, and, because the size of the site precluded expansion, would not satisfy the future needs of the congregation. St. Patrick's serves the community by conducting a variety of outreach programs, including a senior citizen center, a nutrition center, and an Alcoholics Anonymous program. The BZA granted St. Patrick's permission to construct a new church building at a nearby location, 4700 Whitehaven Parkway, N.W., which allows the church to increase its outreach activities and to provide modern facilities accessible to the handicapped.

St. Patrick's presented testimony about the "extraordinary or exceptional situation or condition" of the property that resulted in an "exceptional and undue hardship" upon the owner. D.C.Code § 5–424(g)(3) (1981); 11 DCMR § 3107.2 (1986). The Reverend S. James Steen and Richard S. Beatty, the Senior Warden, testified that the core of the existing building was constructed in 1928. Major additions were built in the 1950s and 1960s, including an addition to accommodate a nursery school. As a result, the structure now has seven different levels of odd configuration. Beatty explained that the growth and development of the church have been hampered by the limitations of this aging and inadequate building. "The continued use of that building has increasingly posed great problems for us and has become a substantial hardship, and it is for that reason that we are asking for the variances." Steen listed some of the problems with the building: the sanctuary is too large, office space is lacking, staff members are scattered throughout the building, and elderly and handicapped parishioners have difficulty reaching the upper levels of the building. Steen explained that there are no bathrooms on the sanctuary level, making it impossible for elderly or handicapped churchgoers to reach these facilities. Indeed, he said, "even if you could put in an eleva-tor, there is no way you could get it to relate to more than two or three of [the seven] levels." Steen added that the lack of parking space poses a serious problem, both for church members and for neighbors. The mechanical systems also need to be replaced. He also discussed a report prepared by the architectural firm of Hartman Cox, which concluded that some of the necessary modifications could be accomplished but that most of the program needs "are difficult, expensive or impossible to achieve on the existing site."

After deciding to build a new church, St. Patrick's retained the real estate brokerage firm of Barnes, Morris and Pardoe to market the Foxhall Road property. Havilland Abbott, a member of this firm, testified as an expert in real estate marketing. Abbott noted that at least 165 persons had been contacted about the property and that 15 groups had visited. Because of a lack of interest in the property, the price was twice substantially reduced. Although the church received and accepted an offer from an international religious organization, Su Bude, the contract was terminated because Su Bude could not raise the necessary funds. The asking price remained at $1.3 million until Daniel O'Donoghue proposed to purchase the property for $1.16 million for conversion into residential units.

When asked about difficulties the brokers encountered in attempting to sell the property, Abbott explained that new or expanding congregations tend to be located around the beltway or further out in the suburbs and that residents of the Foxhall-Reservoir Roads area already belong to established churches. He noted that parking also was a major problem. "Quite a few people got down to the point of talking seriously and then went out and walked around the streets to see that there wasn't any parking to speak of." Abbott also observed that "[i]t's very, very difficult to dispose of because you are talking about such a unique facility." Beatty testified that the church had met with an appraiser who had said that existing zoning permitted construction of eleven townhouse units on the site and that the property was worth

approximately $500,000, not taking into account a developer's costs of razing the existing structure. He added that current assessment of the land alone is $283,000. G.V. Breneman, Jr., an expert in the marketing, management, and development of condominiums and cooperatives in the District of Columbia, testified that the land would not be marketable using the alternative of demolishing the structure and constructing eleven matter-of-right townhouses.

The BZA granted St. Patrick's application for variance relief.[3] It found that St. Patrick's current hardship was caused by the configuration of the existing structure, which prevents economical use in ways permitted by the applicable zoning. The BZA concluded: "The fact that the church built the building over fifty years ago, made several additions over time and has used the building to the present time, does not create a 'self-imposed' hardship."

## II.

We review a BZA decision by applying the substantial evidence test, D.C.Code § 1–1509(e) (1981), which imposes three requirements: the BZA must make "findings on 'each contested issue of fact[';] ... there must be a 'rational connection between the facts found and the choice made,' " so that the BZA's conclusions "rationally follow from the facts;" and "there must be sufficient evidence supporting each finding, *i.e.*, 'more than a mere scintilla....' " *Citizens Association of Georgetown, Inc. v. District of Columbia Zoning Comm'n*, 402 A.2d 36, 41 (D.C.1979) (citations omitted); *accord, C & P Building Limited Partnership v. District of Columbia Board of Zoning Adjustment*, 442 A.2d 129, 130 (D.C.1982); *Monaco v. District of Columbia Board of Zoning Adjustment*, 407 A.2d 1091, 1101 (D.C.1979).

D.C.Code § 5–424(g)(3) (1981) empowers the BZA to authorize a variance where by reason of exceptional topographical conditions or other extraordinary or exceptional situation or condition of a specific piece of property, the strict application of any regulation ... would result in peculiar and exceptional practical difficulties to or exceptional and undue hardship upon the owner of such property, ... provided such relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan....

*See also* 11 DCMR § 3107.2 (1986).

Petitioner's primary argument is that St. Patrick's asserted hardship—the configuration of the existing church structure—was created by the owner itself and, therefore, cannot serve as the basis for a variance under D.C.Code § 5–424(g)(3) (1981) and 11 DCMR § 3107.2 (1986). According to the "self-created hardship rule":

If the peculiar circumstances which render the property incapable of being used in accordance with the restrictions contained in the ordinance have themselves been caused or created by the property owner, ... the essential basis of a variance—that is, that the hardship be caused solely through the manner of operation of the ordinance upon the particular property—is lacking. In such a case, a variance may not be granted.

3 A. Rathkopf and D. Rathkopf, THE LAW OF ZONING AND PLANNING, § 39–01 (4th ed. 1986); *accord*, 3 R. Anderson, AMERICAN LAW OF ZONING, § 20.44, –.45, –.46 (3d ed. 1986); *Carliner v. District of Columbia Board of Zoning Adjustment*, 412 A.2d 52, 54 (D.C.1980); *De Azcarate v. District of Columbia Board of Zoning Adjustment*, 388 A.2d 1233, 1238–39 (D.C.1978); *Bernstein v. District of Columbia Board of*

---

**3.** Petitioner had appealed the Board's February 20, 1985 order to this court (Appeal No. 85–258). One of the grounds for reversal was a claim that a member of the Board who had voted to grant the application had not heard the entire case or read the transcript. The BZA filed an unopposed motion requesting remand, which we granted by order dated June 3, 1985. The BZA member read the transcript, and on June.7, 1985, the Board reissued the previous order as a new proposed order, inviting parties adversely affected to file exceptions. On July 3, 1985, the Board met and reaffirmed the prior decision. On August 9, 1985, the Board issued its final decision, adding new paragraphs 62–66 to reflect the remand proceedings.

*Zoning Adjustment,* 376 A.2d 816, 820 (D.C.1977); *Salsbery v. District of Columbia Board of Zoning Adjustment,* 357 A.2d 402, 404–05 (D.C.1976); *Dwyer v. District of Columbia Board of Zoning Adjustment,* 320 A.2d 306, 307–08 (D.C.1974); *Taylor v. District of Columbia Board of Zoning Adjustment,* 308 A.2d 230, 236 (D.C.1973).

The self-created hardship rule applies, for example, to owners who purchase property with actual or constructive knowledge of zoning restrictions from which they intend to seek administrative relief. 3 R. Anderson, AMERICAN LAW OF ZONING § 20.-44, -.45; *see, e.g., Salsbery,* 357 A.2d at 404–05 (applicant contracted to purchase existing property for non-conforming use without conditioning contract upon obtaining use variance). Similarly, hardship is self-created if it is later manufactured by an owner, that is, "caused by improvements to the land constructed by the applicant with knowledge of the restrictions from which he [or she] seeks relief." 3 R. Anderson, AMERICAN LAW OF ZONING § 20.-46 at 514–15. In *Taylor,* for example, the applicant subdivided the property in a manner that created, among others, a narrow, elongated lot that could not be improved in conformity with zoning restrictions he had known about at the time of subdivision. 308 A.2d at 235–36. *See also Dwyer,* 320 A.2d at 306–08 (whatever hardship the applicant suffered arose from his own acts in using residentially zoned property for law offices); *Bernstein,* 376 A.2d at 820 (where owner had illegally used property as an office, any hardship that resulted from conversion back to legal use was self-imposed).

Petitioner contends that St. Patrick's manufactured its own hardship through misconceived additions to its original building. Relying on *Clerics of Saint Viator, Inc. v. District of Columbia Board of Zoning Adjustment,* 320 A.2d 291 (D.C.1974), St.. Patricks' replies that, in the absence of relief, its property under prevailing circumstances would lose all reasonable use.

In *Clerics,* a religious order had constructed a seminary in 1961, pursuant to a special exception granted by the BZA. 320 A.2d at 292. By the end of ten year's operation, the seminary's enrollment had dropped from approximately forty to two students. *Id.* at 292–93. The owner was unable to transfer the facility to other religious or educational institutions and sought a variance to convert the building into a convalescent or nursing home. In its order denying the variance, the BZA noted that the "decrease in enrollment is due solely to the historical circumstances of decline in religious vocations and departure from the traditional seminary concept of theological education to a more dispersed format of education." *Id.* at 293. The BZA had rejected the Clerics' application, first, because the hardship did not "inhere in the land itself but, rather, [was] caused by the structure on the land." *Id.* We held, however, that because the statute and regulations refer to property, not to land, hardship (for purposes of seeking a variance) may arise either from "topographical conditions of the land itself or from the existence of a structure on the land." *Id.* at 294. As a second ground for denying the variance, the BZA had ruled, citing *Taylor,* that the hardship—the applicant's inability to use the structure as a seminary—was of the applicant's own creation since it had built the structure with knowledge of the zoning restrictions applicable to the land. *Id.* We disagreed. We noted that in *Taylor* this court had deemed the hardship "self-imposed" because the petitioner himself had created the problem; he had subdivided the land in a way that left the elongated lot which he then claimed was unsuited for any allowable use. *Id.* In *Clerics,* however,

> it was not the building of the structure in 1961 which gave rise to the complained of hardship, the building was utilized for its intended purpose as a seminary for a number of years. The hardship was caused by an extraordinary drop in enrollment of seminarians, found by the Board to be "due solely to the historical circumstances of decline in religious vocations and departure from the traditional seminary concept of theological education" and "beyond the control of the seminary administration."

*Id.* We concluded that the hardship, therefore, was not "self-imposed" and thus reversed the Board's denial of a variance.[4]

St. Patrick's contends that its own situation is "highly comparable" to the one in *Clerics.* It points out that the congregation constructed additions enabling St. Patrick's to use the building for five decades but that it did not take any affirmative step that rendered the building unusable. Rather, the church, according to St. Patrick's brief, "made every effort to continue to use the subject site by working around the constraints imposed by the existing structure." St. Patrick's urges us to agree that, as in *Clerics,* external factors beyond the control of the church caused the hardship:

[C]hanges in the role of the church obviated St. Patrick's need for certain features of the original building such as the large sanctuary. In a similar vein, growing societal demands on religious institutions as centers for community outreach programs have created the need for larger meeting rooms and facilities that are readily accessible to the handicapped and the elderly.

In explaining the "hardship" to St. Patrick's, the BZA stated that "[t]he extraordinary or exceptional situation or condition affecting the subject site stems from the existing building on the lot and its structural and physical configuration and condition.... It is an irregularly shaped building that has experienced a number of additions ... [which] have resulted in ... seven different levels thereby making it functionally inefficient to operate as a single use...." The BZA also mentioned problems with the heating, cooling and bathroom facilities. These observations beg the question because they ignore that St. Patrick's itself is responsible for the "extraordinary or exceptional situation or condition" the BZA described.

Unlike the hardship in *Clerics,* which resulted from external societal changes, the hardship in this case arose primarily from the owner's own design and construction decisions over a period of many years. These decisions, coupled with changes in the congregation and in the programs the church wishes to offer, render the building obsolete. We recognize that "external" factors have contributed to the alleged hardship in the sense that the church's membership and mission have expanded in response to new needs in the community which the church, with its present facility, cannot meet. But it is not true, as St. Patrick's argues, that the church itself took no affirmative steps that rendered the building unusable. Congregational growth is generated, to some extent, internally through evangelism and other forms of outreach; it is not altogether "beyond the control of the [church] administration." *Clerics,* 320 A.2d at 294. Moreover, every response by a church to a new community need presupposes an internal decision that the need falls within the mission of the church and shall be accommodated. But, even more fundamentally, St. Patrick's itself elected to construct the additions to the original building over the years, at seven different levels, which have prevented easy access for the elderly and handicapped and otherwise have made the building inconvenient for later-inspired purposes. No one has suggested that these design decisions were dictated by "exceptional topographic conditions or extraordinary or exceptional situation[s] or condition[s]" beyond the control of St. Patrick's itself. D.C.Code § 5–424(g)(3) (1981). Internal decisionmaking, not an external development, is the principal reason why the building no longer suits St. Patrick's purposes.

In sum, even if some of the changes in the congregation and in the programs of the church could be characterized as responses to external demands which a church simply could not ignore while trying to keep faith with its calling, it was, primarily, St. Patrick's own judgments in de-

4. Similarly, in *Johnson v. Board of Appeals of Wareham,* 360 Mass. 872, 277 N.E.2d 695, 696 (1972), the factors that weighed in favor of a variance for converting a church to office suites in a residential zone were clearly external. The court found that heavy traffic and other factors, including the fact that the land nearby was commercially zoned, prevented the property from being converted into residences.

signing and constructing new additions over the years that have left the church unusable. Even if a church should not be expected to foresee every turn of events that might require a physical plant tomorrow far different from the one designed today, the church, to avoid a self-created hardship, would have to justify its history of design decisions in a way that convinces the BZA and, ultimately, this court that those decisions were not the principal reason the church eventually had to seek the variance.[5] St. Patrick's, however, has not shown that more rationally designed building additions on the same lot could not have accommodated the changing needs of the congregation. Because we conclude that most of the church's problems with the existing structure stem from St. Patrick's own design decisions over the years, the Board's conclusion that the hardship was not self-imposed does not "rationally follow from the facts." *Citizens Association of Georgetown, Inc.,* 402 A.2d at 41.[6]

*Reversed and remanded.*

---

**5.** Assume there were evidence convincing the BZA that the existing church facility was as rationally designed and expanded over the years as could reasonably have been expected; that the facility is fully utilized; that there are, nonetheless, new needs which cannot be met by the existing facility; and that the congregation, therefore, has to move in order to continue its mission. In that case, the question of hardship would be the issue we do not reach here: whether the church, in order to sell its property, would be forced—absent a use variance—to accept an unreasonable return on its investment. *See Palmer v. District of Columbia Board of Zoning Adjustment,* 287 A.2d 535, 542 (D.C.1972) (for use variance, petitioner must show property cannot "be put to any conforming use with a fair and reasonable return arising out of the ownership thereof") (quotation omitted). We do not reach this question because, as the hardship issue is presented, it is impossible to say St. Patrick's hardship is not attributable primarily to design decisions which, if more rationally made, would not have led to a need to move the congregation.

**6.** We agree with petitioner and the BZA that our decisions in *National Black Child Development Institute v. District of Columbia Board of Zoning Adjustment,* 483 A.2d 687, 690 (D.C.1984), and *Monaco v. District of Columbia Board of Zoning Adjustment,* 407 A.2d 1091, 1099–1101 (D.C. 1979), which recognize that the BZA may apply a more flexible standard for determining hardship when the applicant is a public service or non-profit entity, are inapplicable here. St. Patrick's did not seek the variance to alter its own use of the property; rather, St. Patrick's sought the variance in order to sell the church to a contract purchaser who would not buy it unless the way was clear for him to use it for another purpose.