*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 20-AA-0264 & 20-AA-0265

TOM MCDONALD, *et al.*, PETITIONERS,

V.

D.C. BOARD OF ZONING ADJUSTMENT, RESPONDENT,

and

WISCONSIN AVENUE BAPTIST CHURCH, *et al.*, INTERVENORS.

On Petitions for Review of an Order of the
District of Columbia Board of Zoning Adjustment
(BZA Case No. 19823)

(Argued Sept. 30, 2021   Decided April 6, 2023)

*Tom McDonald*, petitioner, adopting the brief of Tenleytown Neighbors Association, for himself and petitioner Kibre Genet Haile McDonald.

*Andrea C. Ferster* for petitioner Tenleytown Neighbors Association.

*Karl A. Racine*, Attorney General for the District of Columbia at the time, *Loren L. AliKhan*, Solicitor General at the time, *Caroline S. Van Zile*, Principal Deputy Solicitor General at the time, and *Carl J. Schifferle*, Deputy Solicitor General, filed a Statement in Lieu of Brief for respondent.

*Deborah B. Baum*, with whom *David J. Stute* was on the brief, for intervenors.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and EASTERLY and MCLEESE, *Associate Judges*.

EASTERLY, *Associate Judge*: The Tenleytown Neighbors Association and Tom and Kibre Genet Haile McDonald filed petitions for review of an order of the District of Columbia Board of Zoning Adjustment. The order granted the Wisconsin Avenue Baptist Church and Sunrise Senior Living, LLC, (1) a special exception under the residential zoning regulations to construct a building that would incorporate both a church and a continuing care retirement community ("CCRC") on the current site of the church, as well as (2) a collection of variances, relying in part on a doctrine that this court first recognized in *Monaco v. D.C. Board of Zoning Adjustment,* 407 A.2d 1091 (D.C. 1979), to afford some flexibility in zoning requirements to certain organizations fulfilling a public need. For the reasons set forth below, we affirm the Board's determination that the church—a non-profit entity that provides community services—and Sunrise—a for-profit entity that will serve a statutorily recognized public need by constructing an assisted living facility in Ward 3 where there is high demand for CCRCs—were entitled both to a special exception to construct a CCRC and, with the application of the public good flexibility doctrine, the requested variances.

## I.     General Background

The Wisconsin Avenue Baptist Church is located at 3920 Alton Place NW in Tenleytown.  The property on which the church building sits is more than 35,000 square feet and is an irregular pentagon, bordered by Alton Place NW to the north, residential properties fronting 39th Street NW to the east, Yuma Street NW to the south, and undeveloped National Park Service land off of Tenley Circle to the west with the property line beginning perpendicular to Yuma Street NW and then slanting in to the east to touch Nebraska Avenue NW as it intersects with Alton Place NW:



Properties on the other side of Tenley Circle have "a mix of religious, educational and retail uses."  Although it is near a commercial area, the property is currently zoned R-1-B, which is intended for "predominantly . . . detached houses on moderately sized lots," but allows for religious uses as a matter of right.  At the time the church bought the property in 1954, it was divided into seven single-family lots.  The current church building, which is nearly 70 years old, has a basement with two

stories above and accommodates a 350-person chapel. The building is flanked by a playground and parking lot.

The church building has persistent maintenance issues due to its age, lacks the accessibility features required by the Americans with Disabilities Act, and is too big for its current congregation. But the church does not have the funds to renovate. A number of developers offered to buy the property and assist the church to relocate, but the church considers its current neighborhood its home and does not want to move. In order to remain in its location, the church entered into a contract with Sunrise Senior Living, LLC, pursuant to which the old church building would be demolished and a new building would be constructed that would house both an assisted living facility for Sunrise to operate and a smaller chapel and ancillary facilities for the church to use. Each entity would own its respective facilities and under a condominium regime jointly own the common areas.

Because the property as developed pursuant to this plan would no longer qualify for an as-of-right religious use, the church and Sunrise submitted a joint application to the Board of Zoning Adjustment, requesting permission to build a continuing care retirement community—a use allowed as a "special exception" in a residential zone if it meets certain requirements regarding the effects on the

surrounding community—as well as variances from the applicable number of stories, lot occupancy, and side yard requirements.[1] In response to community opposition to a larger building, the church and Sunrise proposed a 40-foot-tall building that would occupy 57% of the lot and contain four stories. They also re-sited the proposed new building next to the boundary with the National Park Service land on the west side of the lot in order to increase to 36 feet the buffer for the single-family homes to the east. Sixteen percent of the building, spread across parts of the first, second, and below-ground levels, would house a 250-person chapel with some smaller gathering spaces for the church. The remainder would house Sunrise's 86-unit assisted living facility for up to 103 residents. The first three floors of residences would be for seniors "who value their independence but need some assistance with daily activities." The fourth floor would be dedicated to memory care for residents living with dementia and other cognition-related disabilities. Common areas, including therapy and wellness suites, dining and activity rooms, and support offices, would be located throughout.

---

[1] The applicants also requested a special exception to build a 13-foot retaining wall, where usually only a four-foot wall is permitted, but that request (which was granted) is not a subject of this appeal.

After the church and Sunrise signed a memorandum of understanding with Advisory Neighborhood Commission 3E (an automatic party to the proceeding given its proximity to the property) to "ensure that the [proposed facility would] not create any objectionable conditions and otherwise be in harmony with the zone map," the ANC gave its support to the application. The District of Columbia Office of Planning also recommended that the Board approve the application. In November 2018, the Board held a hearing with testimony from church and Sunrise leadership and others who contributed to their development proposal; community members in support of the application; representatives of Tenleytown Neighbors Association; petitioner Genet McDonald on behalf of herself and her husband Tom; opposition experts; and other community members in opposition to the application. Ultimately, the Board granted the special exception as well as all requested variances, subject to conditions not relevant here. Tenleytown Neighbors Association's and the McDonalds' petitions for review timely followed.

## II. Standard of Review

Our review of the Board of Zoning Adjustment's decisions is generally deferential. "We will not reverse the [Board's] decision unless its findings and conclusions are arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law; in excess of its jurisdiction or authority; or unsupported by substantial evidence in the record . . . ." *Metropole Condo. Ass'n v. D.C. Bd. of Zoning Adjustment*, 141 A.3d 1079, 1082 (D.C. 2016) (cleaned up).  However, the Board must make findings on each material contested issue of fact and provide with "reasonable clarity" the reasons for its decision.  *Gilmartin v. D.C. Bd. of Zoning Adjustment*, 579 A.2d 1164, 1167, 1171 n.6 (D.C. 1990).  Although we "defer to the Board's interpretation of its own regulations" and ordinarily "may not substitute" our reasoning for the Board's, *id.*, "the ultimate responsibility for deciding questions of law is assigned to this court," *George Wash. Univ. v. D.C. Bd. of Zoning Adjustment*, 831 A.2d 921, 931 (D.C. 2003), and we will not remand where the law dictates a particular outcome such that remand would be futile, *see Butler v. Metro. Police Dep't*, 240 A.3d 829, 836 (D.C. 2020).

### III.   Whether the Church and Sunrise Qualify for the CCRC Special Exception

#### A.   Additional Background

Before the Board, the church and Sunrise stated that the Sunrise portion of the building would "offer assisted living and memory care services."  They represented that these services would promote the objective of "aging in place" but be "less

intensive than" those provided by "a nursing home." Sunrise staff would be on site seven days a week, 24 hours a day to provide "assistance with daily activities, such as bathing, dressing, transportation and medication reminders," as well as to take care of "household chores such as laundry, cooking, and cleaning" (the resident suites would not have kitchens). Sunrise staff would call physicians and physical therapists to the facility on an as-needed basis. Specifically with regard to memory care, Sunrise would set up a unit on the fourth floor of the building to provide a "safe and stimulating environment" to "individually address[]" each resident's needs with "enriching programming and specialized security."

In their prehearing statement opposing the application for zoning relief, Tenleytown Neighbors Association ("TNA") asserted that, to meet the definition of a CCRC, Sunrise had to provide "a continuity of residential occupancy and health care" and that, despite Sunrise's "emphatic[]" denials,[2] the proposed facility would be providing health care in the form of "assisted living and memory care." Thus, TNA argued, the facility would be in violation of zoning regulations prohibiting "two health care facilities . . . within 1000 feet of each other" because "the Psychiatric Institute of Washington is less than 1000 feet away." Alternatively, TNA

---

[2] It is not clear what statements TNA was referring to.

asserted that if Sunrise would not be providing healthcare, its facility on church property would be no "different from a very expensive hotel" and should not be "locate[d] in a single family neighborhood." Subsequently, at the Board's public hearing, a Sunrise official was asked by their attorney whether he agreed with the "opponents['] . . . state[ment] that Sunrise does not provide healthcare and therefore is somehow not in compliance with the CCRC definition." Responding, it seems, to TNA's argument that the facility *would* be a "healthcare facility," the official said that Sunrise is "not considered . . . a healthcare facility" under D.C. zoning regulations. "But," pressed the attorney, "[Sunrise] do[es] provide some healthcare . . . to the residents of course?" The official replied that he did not "qualify it as healthcare as much as . . . activities of daily living and personal care," but either way, he thought that it was "hair-splitting" and that "the healthcare [facility] definition specifically doesn't include [Sunrise's] use."

Relying on this testimony, TNA shifted its attack after the hearing and included in its proposed findings of fact and conclusions of law a determination that the facility would not meet the definition of a CCRC because Sunrise had admitted that it would "provide[] no health care." The church and Sunrise responded to this argument in their proposed findings of facts and conclusions of law and explained that the "proposed CCRC use would be licensed under the [CCRC Licensure Act,

D.C. Code § 44-151.01 et seq.,]"[3] and fit the CCRC use definition because it would "provide a continuity of residential occupancy and healthcare in the form of memory care and assistance with daily living for elderly persons over 60 years of age who can no longer care for themselves."

In its findings of fact, the Board called the facility that the church and Sunrise proposed to build a "CCRC" and more specifically found that the facility would (adopting the applicants' language) "provide assisted living units designed for older adults who value their independence but need some assistance with daily activities such as bathing, dressing, transportation, and medication reminders." The Board noted that the facility would be staffed around the clock with as many as 30 staff members available during peak hours to assist residents, the residential units would not have kitchens, and there would be common dining rooms and other entertainment or common spaces as well as a "fitness and physical therapy space."

---

[3] It is not clear why the church and Sunrise cited the CCRC Licensure Act. That Act contemplates a building or complex that provides multiple levels of service, with distinct licensure requirements, in one living facility for seniors, *see* D.C. Code § 44-151.01(3), (4) (defining "continuing care services" to "mean[] the continuum of care, ranging from independent living to assisted living to nursing home care"), but does not displace the distinct licensure requirements for assisted living facilities (or nursing home facilities), *see id.* § 44-151.16. Instead it layers on both additional protections for residents who contract for a changing set of services over time and financial requirements for the facilities. *See id.* §§ 44-151.02, -151.06.

The Board also found that the CCRC would "provide a dedicated memory care floor" that would be "a secure floor with staff trained to understand the needs of the people with dementia." The Board distinguished the proposed facility from "independent living [and] skilled nursing facilities," and endorsed the research from the church and Sunrise's application both that there was a specific need for assisted living facilities in the District and that the Council's aim was to increase the supply of these facilities, "as evidenced by the passage of the Assisted Living Residence Regulatory Act of 2000," D.C. Code § 44-101.01 et seq., which established a specific licensure framework for them.

In its conclusions of law, the Board (1) explained that a CCRC, per 11-U D.C.M.R. § 203.1(f)(1) (2018),[4] "must include dwelling units for independent living, assisted living facilities, or a licensed skilled nursing care facility" and (2) "conclud[ed] that" the facility the church and Sunrise proposed to build "meets the definition of an assisted living facility CCRC" (even as it noted that "assisted living facility" was undefined in the zoning regulations) "because it will provide residential accommodations, assistance with daily living, healthcare services and

---

[4] We cite to the 2018 version of the regulations throughout because it was in force at the time of the Board's decision. The zoning regulations have since been amended, and although regulations relevant to this decision are unchanged in substance, this provision is now located at 23-U D.C.M.R. § 203.1(g).

memory care for elderly persons of 60 years of age who value their independence but need some assistance with daily activities," citing back to its findings of fact. The Board explicitly "reject[ed]" TNA's argument that the proposed facility "*should be* classified a 'healthcare use' because CCRC uses specifically allow for the provision of some health care services" (emphasis added), but the Board did not explicitly acknowledge or reject TNA's alternative argument that the proposed facility could not be a CCRC because it would not provide the requisite health care services. The Board did not state what it understood the term "health care services" to mean.

## B.    Analysis

In evaluating a special exception application for a CCRC, the Board must confirm that the property will be used as a continuing care retirement community within the meaning of the zoning regulations. The zoning regulations provide information regarding the approved uses for a CCRC in two places. The regulation enumerating the permitted "special exception uses" in residential areas, 11-U D.C.M.R. § 203.1 (2018), lists CCRCs as a permitted use and further specifies that the CCRC use "shall" include: "(A) [d]welling units for independent living; (B) [a]ssisted living facilities; or (C) [a] licensed skilled nursing care facility." *Id*.

§ 203.1(f)(1). And, in the definitional provisions in 11-B D.C.M.R. § 100.2 (2018), a CCRC is defined as

> [a] building or group of buildings providing a continuity of residential occupancy and health care for elderly persons. This facility includes dwelling units for independent living, assisted living facilities, or a skilled nursing care facility of a suitable size to provide treatment or care of the residents; it may also include ancillary facilities for the further enjoyment, service, or care of the residents. The facility is restricted to persons sixty (60) years of age or older . . . .

*Id.*

Before this court, TNA and the McDonalds focus on the single reference to "health care" in the first sentence of the definitional provision and argue that (1) the Board failed to "address the question raised by TNA of whether Sunrise's facility can satisfy the definition of a CCRC without providing 'health care'" and (2) the Board should not have approved a special exception to allow Sunrise to build the proposed assisted living facility on the church's property because Sunrise conceded that the proposed facility will not provide "health care." Because we read the regulations to have only one reasonable interpretation that is consistent with the Board's conclusions, we affirm.

As a preliminary matter, TNA and the McDonalds are correct that the Board's analysis of whether there exists a "health care" requirement in the zoning regulations, see *supra* Section III.A (including "healthcare services" in its conclusion of law that the proposed facility "meets the definition of an assisted living facility CCRC"), was at best ambiguous and does not provide the specificity or clarity we would typically require to affirm agency action. *See Gilmartin*, 579 A.2d at 1171 n.6 (reaffirming that our court ordinarily will not affirm an agency decision that is not adequately explained or if we would have to substitute our own reasoning to do so). We conclude, however, that we need not seek clarification from the Board in this instance because we are confronted with a legal question that we are empowered to resolve, *George Wash. Univ.*, 831 A.2d at 931, and that has only one logical outcome, *see Durant v. D.C. Zoning Comm'n*, 139 A.3d 880, 883 (D.C. 2016) (explaining that we owe no deference to interpretations of regulations that are "unreasonable or contrary to the language of the applicable provisions"). Specifically, we consider whether the zoning regulations at issue can reasonably be read to impose an individual "health care" requirement on each of the three types of facilities that can comprise a CCRC use, and conclude the regulations cannot be read in such a way. Further, because under a correct conception of the regulations, the proposed facility clearly qualified for a special exception as an assisted living CCRC based on the Board's findings, there is no need to remand for consideration of this

question.  *See Cummins v. D.C. Zoning Comm'n*, 229 A.3d 768, 781 (D.C. 2020) ("[R]emand is not required in cases where the agency would doubtless reach the same result and reaffirm its prior order." (internal quotation marks omitted)); *cf. Bentt v. D.C. Dep't of Emp. Servs.*, 979 A.2d 1226, 1232-36 (D.C. 2009) (analyzing a question of law and concluding that no remand was warranted where "further factfinding [was] unnecessary").

We disagree with TNA and the McDonalds that the reference to "health care" in an initial sentence collectively describing CCRCs can be reasonably read to impose an individual "health care" requirement on each of the three specified facilities: independent living, assisted living facilities, or a skilled nursing care facility.  "Independent living," for instance, on its face conveys that residents will live on their own, without any particular provision of health care services.  That "independent living" is listed as a stand-alone CCRC use[5] indicates that "health care" in the zoning definition is not meant to impose an additional requirement for a specific amount of "health care" on each use but rather is prefatory, descriptive language of the full range of services that could be provided by CCRCs.  In other

---

[5] Independent living facilities that are not connected to assisted living or nursing home facilities may not house more than eight residents, *see* 11-U D.C.M.R. § 203.1(f)(2), presumably to avoid the construction of the equivalent of the "very expensive hotel[s]" that TNA fears will be built under the guise of a CCRC use.

words, as we read the regulations, the three types of uses that are expressly "include[d]" as CCRCs—"dwelling units for independent living, assisted living facilities, or a skilled nursing care facility," 11-B D.C.M.R. § 100.2 (defining CCRCs); *see also* 11-U D.C.M.R. § 203.1(f)(1) (requiring one of these three uses)— have already been deemed to fall under the umbrella of "continuity of residential occupancy and health care for elderly persons." 11-B D.C.M.R. § 100.2. Thus the operative question is whether a proposed facility will be used in one of the three ways enumerated in the regulation; specifically in this case, the question is whether the facility the church and Sunrise propose to build will be used as an assisted living facility.

An examination of the District's statute regulating assisted living facilities reinforces our conclusion that it would be unreasonable to interpret the zoning regulations to impose a separate health care requirement on this component CCRC entity. The Assisted Living Residence Regulatory Act (first codified in 2000), D.C. Code § 44-101.01 et seq., defines an "assisted living residence" as an entity that combines housing with "health . . . assistance." *Id.* § 44-102.01(4).[6] Specifically, this entity is required to provide assistance with activities of daily living, *id.*

---

[6] At oral argument, Sunrise represented that the proposed facility would meet the definition of an assisted living residence in this statute.

§§ 44-101.01, -103.01, and to "*facilitate access* for a resident to appropriate health and social services," *id.* § 44-106.07(b) (emphasis added). The statute does not require that assisted living facilities provide in-house "health care."[7] It would be irrational in our view to read 11-B D.C.M.R. § 100.2, a definitional provision in the zoning regulations, to impose on assisted living facilities some sort of separate "health care" obligation beyond what its licensure statute requires and to put a zoning authority in the position of determining what qualifies as such "health care." Accordingly, we decline to read the regulation in the manner TNA and the McDonalds propose.

The Board concluded that the facility Sunrise proposed to build on church property would be a CCRC use by virtue of its function as an assisted living facility, and that is all the Board was required to determine. Its factual findings clearly

---

[7] TNA and the McDonalds agree that this Act is informative, but ignore its substantive provisions and rely exclusively on its "philosophy of care" section, D.C. Code § 44-101.02(b)(1). This provision states that "[t]his chapter shall be interpreted in accordance with the following philosophy of care," suggesting that it applies only where there is interpretational ambiguity, which we do not discern in the definition of an assisted living residence. In any event this "philosophy" merely echoes, rather than contradicts, the provisions cited above. *See* D.C. Code § 44-101.02(b)(1) (explaining that "[a]n assisted living residence is a program which combines housing, health, and supportive services for the support of residents aging in place" and that its "function . . . is to provide or coordinate personalized assistance through" inter alia "provision or coordination of health services").

support the conclusion that the proposed facility will be an assisted living facility.[8]

Specifically, the Board found that the proposed facility would have staff available 24 hours a day, seven days a week who would provide residents with "some assistance with daily activities such as bathing, dressing, transportation, and medication reminders"; the facility would also include "a dedicated memory care floor" for "older adults living with memory loss, including Alzheimer's and other forms of dementia" which would be staffed by individuals "trained to understand the needs of the people with dementia." Distinguishing the proposed facility from the other types of CCRCs, the Board observed that the proposed facility would "not offer units for independent living []or skilled nursing facilities." The Board then expressly determined that the proposed facility met "the definition of an assisted living facility CCRC because it will provide residential accommodations, assistance with daily living, healthcare services and memory care for elderly persons."

---

[8] TNA and the McDonalds claim that Sunrise's intention to seek licensure under the CCRC Licensure Act, see *supra* note 3, rather than the Assisted Living Residence Regulatory Act, would allow Sunrise to avoid a requirement to provide health care services. But as we explain, there is no separate health care requirement under the zoning regulations to avoid. In any event, the CCRC Licensure Act does not displace the licensure requirements of the Assisted Living Residence Regulatory Act, see *supra* note 3, and the CCRC Licensure Act incorporates the definition of "assisted living residence" from the Assisted Living Residence Regulatory Act, *see* D.C. Code § 44-151.01(1). Sunrise said before this court that the proposed facility would meet this definition. See *supra* note 6.

TNA and the McDonalds highlight the testimony from Sunrise's representative disavowing the provision of "health care," but this testimony is unhelpful to them, both because the proposed facility did not need to provide health care, and because, in providing this testimony, the representative explicitly reaffirmed that the facility would provide assistance with "activities of daily living and personal care," part of the Board's calculus in concluding the facility would be "an assisted living facility CCRC." Accordingly, this evidence actually adds to the substantial evidence calculus in favor of the church and Sunrise.

For these reasons, we affirm the Board's approval of the CCRC special exception.

**IV. Whether the Board Properly Granted the Church and Sunrise's Requested Variances**

**A. Additional Background**

In order to construct the proposed design, the church and Sunrise also applied for four area variances, three of which are contested before this court: (1) a variance to fit four stories in the building height ordinarily allowed for three, 11-D D.C.M.R. § 303.1 (2018); (2) a variance to occupy 57% of the lot where the maximum lot

occupancy is ordinarily only 40%, *id.* § 304.1; and (3) a variance to eliminate the side yard by the National Park Service land where it ordinarily must be at least eight feet, *id.* § 307.1. The Board is empowered to grant these variances when:

> [1] by reason of exceptional narrowness, shallowness, or shape of a specific piece of property . . . or other . . . exceptional . . . condition of a specific piece of property,

> [2] the strict application of any [zoning] regulation . . . would result in peculiar and exceptional practical difficulties to . . . the owner of such property, . . .

> [3] provided such relief can be granted without substantial detriment to the public good and without substantially impairing the intent, purpose, and integrity of the zone plan as embodied in the zoning regulations and map.

D.C. Code § 6-641.07(g)(3); *see St. Mary's Episcopal Church v. D.C. Zoning Comm'n*, 174 A.3d 260, 269 (D.C. 2017) (summarizing D.C. Code § 6-641.07(g)(3)).

To satisfy the first prong, the church and Sunrise pointed to a "confluence of [physical] factors" that they asserted make the property unique and constitute "exceptional condition[s]": the unusual five-sided shape of the lot, its large size (approximately seven times larger than the surrounding lots), its frontages on three streets, and its location on "a major thoroughfare."

The church and Sunrise also argued that the Board should conduct its analysis

of this first prong of the variance test with flexibility accorded to non-profit "organization[s] devoted to public service." The church and Sunrise highlighted the church's need to remain financially viable and its desire to stay in its current location, which they claimed was only possible through partnership with Sunrise. At the hearing before the Board, the church stated that it did not have the funds to renovate its building. It acknowledged that it had been approached by "[m]any developers," but explained it had no interest in selling the property and moving to another location because its "congregants live very close by." The church also informed the Board that it had rejected the possibility of splitting up the lot and selling off part of the land for single-family homes after consultants informed it this plan would "not generate sufficient funds," and that it had rejected the idea of combining with a mega-church because it would compromise the church's "identity, . . . independence, and . . . family-like feel" and adversely impact the neighborhood. The church informed the Board that contracting with Sunrise to build a combined church and assisted living facility was the church's "only viable option."

At the same time, the church and Sunrise highlighted that the proposed facility would "help alleviate the pressing need for senior care in the District" and argued that "[a]ssisted living facilities are an important component of the District's overarching objective to promote aging in place." The Office of Planning echoed

this sentiment in its recommendation based on a report from the District's Office of Aging.

The church and Sunrise also argued that the "specific design of the [proposed] building [wa]s an institutional necessity in order for the church to leverage its property with [the] mission-compatible use" of an assisted living facility. The church and Sunrise noted that, with specific code requirements such as use of steel and concrete rather than wood and other design needs like double-loaded corridors, the assisted living facility would need to have at least 85 units to make the construction financially feasible. And in order to accommodate both a facility of this size with a memory care unit and space for the church, they needed the requested variances to increase the lot occupancy and add another story to the building. They also argued they needed a variance to eliminate the side yard adjacent to the National Park Service land in order to create a larger buffer area between the building and neighboring homes.

TNA and the McDonalds raised a number of objections to the requested variances throughout the Board's review process.[9]   Regarding the asserted

---

[9] The McDonalds voiced some objections separately from TNA before the Board, more generally arguing that Sunrise was taking advantage of the church to

"exceptional condition" of the property, TNA argued that there was nothing unique about the lot and that its size made it ideal for subdividing or selling to another place of worship. Regarding public good flexibility, TNA argued that this flexibility, traditionally applied to non-profits, should not be extended to Sunrise, a for-profit entity, in order to help them to be more profitable. TNA also disputed that the partnership or design of the building was an "institutional necessity." TNA stressed evidence that the church could make $1.7 million just from splitting the lot and selling off part of their land and argued that the church had not disclosed how much money it actually needed to remain viable.

The Board concluded that the church and Sunrise had adequately substantiated their requests for variances regarding number of stories, lot occupancy, and lot placement. Accepting the "confluence" of the three physical factors the church and Sunrise cited to establish an "exceptional condition"—the size, shape with multiple frontages, and location of the lot—but also adding to the "confluence" the institutional needs of the church, the Board found that the church and Sunrise satisfied the first step of the variance test outright. In addition, the Board determined that the church and Sunrise should benefit from flexibility accorded "when the

---

circumvent zoning laws and that the development would harm their home, the character of the neighborhood, and the zoning plan.

applicant is a non-profit organization devoted to public service." The Board concluded that the proposed facility would "promote[] a public good in both the continuation of the existing church and the establishment of the CCRC use" and thus rejected the argument that public good flexibility should be inapplicable just "because Sunrise is a for-profit organization and [the church] will occupy only a small portion of the [b]uilding." Regarding the church's partnership with Sunrise, the Board credited the evidence from the Office of Planning and District's Office of Aging and noted that there was a "public need for more facilities to address the rising population of seniors in the District." The Board further found that there was "sufficient evidence that the partnership with Sunrise to construct the Building" was an institutional necessity and that the requested variances were "required for the CCRC use, and therefore, the partnership between [the church] and Sunrise[] to be economically viable."

Under the second prong of the variance test, the Board concluded that the strict application of zoning regulations would result in "exceptional practical difficulties" to the church and Sunrise because it would preclude them from being able to build and therefore "hinder[] [the church's] ability to continue to operate from its historic location." The Board credited the church and Sunrise's contention, including sworn testimony at the hearing, that having only three floors and 40% lot

occupancy would not be economically viable. And the Board agreed that the "irregular shape of the lot" and the "[a]pplicants' desire to provide . . . the greatest buffer" to the nearby residences created practical difficulties in reserving the required eight-foot side yard on both the east and the west.

Under the third prong of the variance test, the Board concluded that "approval of the requested variance relief [would] not result in substantial detriment to the public good" and would not substantially impair the zone plan. The Board noted that the building would be within height requirements, would occupy less square footage than the matter-of-right occupancy permitted for a church (60% compared to 40% for other uses), and would reduce its impact on the surrounding residential properties by shifting closer to the property line with National Park land. The Board also highlighted its determination that the "proposed CCRC use satisfies the requirements for special exception approval, such that the use is consistent with the Zoning Regulations."

### B. Analysis

Before this court, TNA and the McDonalds argue that the Board should not have granted the requested number of stories, lot occupancy, and side yard variances

for a collection of reasons: (1) public good flexibility does not apply to Sunrise as a matter of law because it is a for-profit applicant that does not otherwise serve a public need and that without it the variance requests fail; (2) the Board's factual findings regarding the "institutional necessity" needed to substantiate public good flexibility are not supported by substantial evidence; and (3) the Board's conclusions regarding the "practical difficulties" faced by the applicants do not follow from the identified "exceptional conditions." Although the heading of the final section of their brief indicates that TNA and the McDonalds also raise a challenge to the Board's assessment of the third prong of the variance test, in fact this section continues to discuss their opposition to the expansion of the public good flexibility doctrine to apply to this case. We conclude that the Board properly applied public good flexibility to the requested variances and that its findings in doing so were supported by substantial evidence. Consequently, we affirm.

### 1. The Variance Test and Public Good Flexibility

The first prong of the variance test—the exceptional condition prong—refers to something unique about the property itself, often a topographical characteristic or pre-existing structure on the land. *Ait-Ghezala v. D.C. Bd. of Zoning Adjustment*,

148 A.3d 1211, 1217 (D.C. 2016). The condition can arise from a "confluence of factors," but the "critical point is that the extraordinary or exceptional condition must affect a single property," rather than exist as part of "the general conditions in the neighborhood." *Gilmartin*, 579 A.2d at 1168 (internal quotation marks omitted); *see, e.g.*, *Ait-Ghezala*, 148 A.3d at 1217 (rejecting as an exceptional condition a lot's location on Blagden Alley where the Board made no findings about whether it was "a shared feature of several lots" nearby). Moreover, "[t]he [Board] generally cannot grant a variance [based on an exceptional condition] just because the property makes it difficult for the owner to construct a particular building . . . if the owner could use or improve the land in other ways compatible with zoning restrictions." *Draude v. D.C. Bd. of Zoning Adjustment*, 527 A.2d 1242, 1255 (D.C. 1987). In other words, ordinarily the property must possess a unique feature that impedes compliance with the zoning regulations, and "the proposed use of a property [will] not [be] a sufficient basis for determining the presence of exceptional conditions." *Ait-Ghezala*, 148 A.3d at 1217 (internal quotation marks omitted).

When an applicant seeks a variance "to meet a public need or serve the public interest," however, the Board may consider the applicant's particular proposed use and its needs as an exceptional condition, *Neighbors for Responsive Gov't, LLC v. D.C. Bd. of Zoning Adjustment*, 195 A.3d 35, 56 (D.C. 2018), because "public need

. . . is an important factor in granting or denying a variance," *Monaco v. D.C. Bd. of Zoning Adjustment*, 407 A.2d 1091, 1098 (D.C. 1979). Our court first recognized this doctrine—which the Board referred to in this case as "public good flexibility"—in *Monaco,* a case addressing the Republican National Committee's plan to build a new office on a site near the Capitol after its old office was condemned to build another building for the Library of Congress. *Id.* at 1095, 1098. Noting that the bare desire to occupy a particular site would not usually be an exceptional condition, we stated that "the site [was] uniquely suitable for [the RNC's] headquarters" because of the proximity to the Capitol and declared that "the [Board] may be more flexible when it assesses a non-profit organization which is a well[-]established element of our governmental system." *Id.* We also noted that the "characterization of the [proposed] use [of the site] as a public service will . . . be significant," distinguishing as an example a request for a variance by a hospital from a request by "an ordinary commercial user" to use a site for parking facilities. *Id*. at 1099. We concluded that "when a public service has inadequate facilities and applies for a variance to expand into an adjacent area . . . then the Board . . . does not err in considering the needs of the organization" as an exceptional condition. *Id.*

Since *Monaco*, the doctrine has evolved in four pertinent ways. First, we have moved beyond the factual application of the doctrine to a government-adjacent entity

in *Monaco* and have extended this flexibility to a variety of applicants, including a social service center, a university hospital, and at least in dicta, a church. *See Dupont Circle Citizens Ass'n v. D.C. Bd. of Zoning Adjustment*, 182 A.3d 138, 142-43 (D.C. 2018) (collecting cases and noting that "it requires no extension of the *Monaco* doctrine to hold that a church may be a public service organization entitled to additional flexibility"); *cf. St. Mary's Episcopal Church*, 174 A.3d at 268, 271 (applying public good flexibility to a university's organization for Jewish students). Although we thus far have applied the doctrine only to non-profit organizations, *see Dupont Circle Citizens Ass'n*, 182 A.3d at 143, some of our cases also refer to "public service organizations" as eligible for the flexibility, *see, e.g.*, *Citizens for Responsible Options v. D.C. Bd. of Zoning Adjustment*, 211 A.3d 169, 180 (D.C. 2019), and we have noted that a symbiotic relationship between a church and a for-profit use could potentially qualify, *see Dupont Circle Citizens Ass'n*, 182 A.3d at 143 n.5.

Second, we have clarified that the doctrine does not apply only when an organization is seeking to expand existing facilities, as was the case in *Monaco*. *See also Draude*, 527 A.2d at 1255-56. The Board can also employ this flexibility when an eligible applicant is seeking "to add or substitute a new use of the property in question." *Neighbors for Responsive Gov't*, 195 A.3d at 59. But a non-profit that

wishes to turn its current site over to a for-profit entity, without remaining on the site itself, cannot benefit from public good flexibility. *Foxhall Cmty. Citizens Ass'n v. D.C. Bd. of Zoning Adjustment*, 524 A.2d 759, 764 n.6 (D.C. 1987).

Third, our cases have developed an additional two-part test that an organization eligible for public good flexibility must meet to show that its needs are truly an exceptional condition. The organization must show "(1) that the specific design it wants to build constitutes an institutional necessity, not merely the most desired of various options, and (2) precisely how the needed design features require the specific variance sought." *Draude*, 527 A.2d at 1256.[10]

Fourth, our decisions since *Monaco* have not limited application of public good flexibility to the first "exceptional conditions" prong of the standard variance test. *See, e.g.*, *St. Mary's Episcopal Church*, 174 A.3d at 271 (applying the doctrine

---

[10] In the context of applying public good flexibility, our cases vary as to how exactly the *Draude* test grafts onto or falls within the prongs of the standard variance test. *See, e.g.*, *Neighbors for Responsive Gov't*, 195 A.3d at 56 (mentioning it as a stand-alone requirement); *St. Mary's Episcopal Church*, 174 A.3d at 271 (applying it within the second-prong analysis). Nonetheless, the *Draude* test indisputably can be applied within the first prong of the analysis, as it was in this case, see *infra*, and the parties do not dispute the Board's placement of it in the first prong. *See Draude*, 527 A.2d at 1256 (announcing this test within the analysis of the first prong of the standard variance test).

to the second "practical difficulties" prong). By statute and case law, the first and second prongs of the general test for a variance are clearly connected: the identified exceptional conditions are relevant because they create "practical difficulties" for the applicant that the requested variances would alleviate. *See* D.C. Code § 6-641.07(g)(3) ("Where, *by reason of* . . . [an] exceptional situation or condition of a specific piece of property, the strict application of any regulation . . . would result in peculiar and exceptional practical difficulties . . . ." (emphasis added)); *see also Fleischman v. D.C. Bd. of Zoning Adjustment*, 27 A.3d 554, 562 (D.C. 2011) (discussing the practical difficulties by reference back to the "extraordinary and exceptional conditions inherent in the property"); *Wash. Canoe Club v. D.C. Zoning Comm'n*, 889 A.2d 995, 1002 (D.C. 2005) (referring back to the "confluence of factors" under prong one when petitioners challenged uniqueness of the practical difficulties under prong two); *Metropole Condo. Ass'n v. D.C. Bd. of Zoning of Adjustment*, 141 A.3d 1079, 1084 (D.C. 2016) (remanding for more findings that would link the exceptional "narrowness of the property" to the applicant's claimed "practical difficulty" of fewer parking spaces without a variance).

To meet the "practical difficulties" requirement under the second prong of the variance test, applicants must demonstrate two things: first, "that compliance with the area restriction would be unnecessarily burdensome" and second, "that the

difficulties are unique to the particular property." *Neighbors for Responsive Gov't*, 195 A.3d at 56 (internal quotation marks omitted); *accord Gilmartin*, 579 A.2d at 1170. "[T]he nature and extent of the burden which will warrant an area variance is best left to the facts and circumstances of each particular case." *Gilmartin*, 579 A.2d at 1171 (internal quotation marks omitted). Not every inconvenience amounts to an "unnecessary burden," but "at some point economic harm becomes sufficient" especially "when coupled with a significant limitation on the utility of the structure." *Id.* at 1170-71.

### 2. Application of the Variance Test and Public Good Flexibility in This Case

We assume without deciding that the Board erred in concluding that the shape with multiple frontages, size, and location of the lot created an "exceptional condition" that satisfied the first step of the variance test. We thus turn to examining the Board's reliance on public good flexibility. The root of the public good flexibility doctrine (adopting the Board's nomenclature) is that "public need" for a use should be a relevant factor in zoning decisions. *Monaco*, 407 A.2d at 1098 ("[P]ublic need for the use is an important factor in granting or denying a variance . . . ." (internal quotation marks omitted)). As noted above, the doctrine has been

applied to a variety of nonprofit organizations and assumed to apply to a church. *Dupont Circle Citizens Ass'n*, 182 A.3d at 143. The threshold question presented in this case is whether the doctrine may apply when an organization eligible for public good flexibility on its own is applying jointly with a for-profit organization for a variance. TNA and the McDonalds argue that it cannot be so because it never has been so before. But this observation hardly settles the matter because this doctrine is one of judicial creation and has clearly evolved since its initial conception.

So long as the doctrine's objective, i.e., to facilitate construction for organizations so that they can serve public needs, is fulfilled, we see no reason why it should not apply to this hybrid circumstance. Accordingly, we hold that public good flexibility may apply to a non-profit organization serving a public need—one squarely within the previous beneficiaries of the flexibility in our cases—and its for-profit use partner, as joint applicants, with the following limitations to avoid abuse. The joint applicants must demonstrate that, in addition to enabling the non-profit organization that serves a public need to remain in place or upgrade its services, the for-profit organization too is fulfilling a public need. Relatedly, we stress that the Board must substantiate its findings and conclusions regarding the public need that each entity would serve. Further, we limit this extension of public good flexibility to circumstances in which the non-profit entity serving a public need has a

preexisting presence on the site at issue, to ensure that public good flexibility does not become a loophole to allow a "commercial user before the [Board] . . . to establish uniqueness in a particular site's exceptional profit-making potential," *Monaco*, 407 A.2d at 1098, just by including some small space for a non-profit in its plans. The test from *Draude*, see *supra* Section IV.A, also remains in place to ensure that an eligible organization's need to expand or alter its use on its property "does not . . . automatically exempt [it] from all zoning requirements." *Draude*, 527 A.2d at 1256. And, as with every variance application, the joint applicants seeking to benefit from public good flexibility will still need to meet their burden under the third prong of the standard variance test: they must show that their requested variances will not result in a "substantial detriment to the public good" or "substantially impair[] the intent, purpose, and integrity of the zone plan." D.C. Code § 6-641.07(g)(3); *see also Neighbors for Responsive Gov't*, 195 A.3d at 59 ("While the addition of a new use may raise greater concerns than the expansion of an existing use [when applying public good flexibility], we think those concerns are best addressed by [the third prong's] requirements for obtaining a variance . . . .").[11]

---

[11] For this reason we do not see merit in TNA's and the McDonalds' concern that extending the public good flexibility to these applicants will "pave the way [for] other forms of market rate or luxury housing, without regard to the protective restrictions in the applicable zone districts set forth in the zone plan." And as discussed above, TNA and the McDonalds have not made an argument to this court under this third prong.

In this case the Board considered a joint application from a church, a non-profit entity serving the public need, and Sunrise, a for-profit entity. The Board found that the church would serve the community through not only the provision of religious services but also counseling, clothing and food drives, and service projects.[12] The Board further found that the church could not remain in its current location without the assistance from Sunrise. And the Board also considered Sunrise's use of its portion of the building as an assisted living facility. The Board found that this proposed use would serve a public need, recognized in District law, for more housing for the District's aging population and would assist the local community. The Board clearly applied public good flexibility based on its determination that the proposed building "promotes a public good in *both* the continuation of the existing church and the establishment of the CCRC use" (emphasis added), and that the church and Sunrise "provided sufficient evidence that the partnership with Sunrise to construct the [b]uilding was the only viable way in which [the church] could continue to operate on [its] Property." Accordingly, the Board properly concluded that public good flexibility could apply.

---

[12] TNA and the McDonalds did not make any argument that the church alone would need to show more than it did in this case to benefit from public good flexibility.

We are unpersuaded by TNA's and the McDonalds' various challenges to the church and Sunrise's eligibility for public good flexibility. TNA and the McDonalds stress here that the church will only occupy 16% of the new building, reminding us of our holding in *Foxhall Community Citizens Ass'n* that a non-profit that wished to turn its current site over to a for-profit entity, without remaining on the site itself, could not benefit from public good flexibility. *See* 524 A.2d at 764 n.6. But the church here is not leaving—indeed the whole point of its partnership with Sunrise is to enable it to stay—and though 16% may sound like a small segment of the building, the fact remains the church's portion will include a chapel with seating for 250 people as well as smaller gathering spaces. Thus, this is hardly a case where the non-profit's de minimis presence on site is being used as an artifice to justify the application of public good flexibility.

TNA and the McDonalds also object to the Board's reliance on the zoning plan's desire to encourage "aging in place" in residential districts, 11-D D.C.M.R. § 100.2(b), which they assert just refers to helping residents remain in their existing homes and does not extend to the construction of assisted living facilities. But even if this assertion is correct, the zoning regulations also create the special exception used here to allow assisted living facilities larger than eight units in residential zones. 11-U D.C.M.R. § 203.1(f)(2). It is within the Board's discretion to balance the

various directives of zoning regulations in interpreting them, and we defer to the Board's interpretation of its own regulations unless clearly erroneous, which this is not. *Gilmartin*, 579 A.2d at 1167; *cf. French v. D.C. Bd. of Zoning Adjustment*, 658 A.2d 1023, 1034 (D.C. 1995) (deferring to the Board in allowing a special exception where permitted in regulations argued to be contrary to the general terms of the Comprehensive Plan).

TNA and the McDonalds argue that the record indicates the presence of many assisted living and retirement communities in Ward 3, and so there is no public need for such facilities in the instant location. The Board focused on Ward 3, though, and noted that it was "experiencing some of the highest growth in the District for this demographic," a conclusion with support in the record. TNA points to nothing that shows this conclusion was incorrect, and there is nothing illogical about concluding that an area with a high population of aging residents may proportionally lack sufficient assisted living facilities.

TNA and the McDonalds also argue that "'public benefit' [by which we assume they mean 'public need'] is analogous to the definition of 'special merit' provision under [the District's] historic preservation law," under which they claim Sunrise would not qualify because its facility would not cater to low-income

individuals or accept insurance. But TNA and the McDonalds provide no support for why we should look to this statutory historic preservation definition as analogous in the face of the judicially created public good flexibility doctrine, and we see no reason to do so in this case.

Accepting that the public good flexibility doctrine may apply to the church and Sunrise's application, we turn to TNA's and the McDonalds' argument that the Board's findings under *Draude*, 527 A.2d at 1256, regarding whether the church and Sunrise had adequately shown that the requested design was an "institutional necessity, not merely the most desired of various options," were not supported by substantial evidence. We disagree. The church and Sunrise submitted evidence regarding the other options the church had considered and why it had rejected those options, including the advice it had received from consultants about how it could remain on the property, and provided sworn testimony that its congregants live nearby. *See St. Mary's Episcopal Church*, 174 A.3d at 271 (upholding institutional necessity where the size and leasing arrangement of the building were economically necessary); *cf. id.* at 269-70 (upholding the need to remain near the synagogue's "primary constituency" as an exceptional condition). The church and Sunrise also presented sworn testimony and other evidence regarding the specific design required for the partnership to be financially viable, including the minimum of 85 units, need

for certain building materials and double-loaded corridors, and the yearly costs of staff and computer systems. *See id.* at 271 (upholding institutional necessity where "the building's footprint would have to remain the same due to building code requirements" and other needs). It was within the Board's discretion to credit this testimony and supporting evidence. *Fleischman*, 27 A.3d at 562 ("As the trier of fact, the Board may credit the evidence upon which it relies to the detriment of conflicting evidence, and need not explain why it favored the evidence on one side over that on the other." (internal quotation marks omitted)).[13] We thus uphold the Board's conclusion that the proposed design is an institutional necessity for the church and Sunrise such that the public good flexibility could apply to the Board's evaluation of exceptional conditions.

Lastly we consider TNA's and the McDonalds' contention that the Board considered exceptional conditions that do not actually impede the use of the land or create practical difficulties, and so the decision must be reversed. We agree that the law requires interconnectedness, see *supra* Section IV.B.1, but disagree that the

---

[13] TNA and the McDonalds note that Sunrise has built smaller facilities on smaller lots without requesting any variance relief; but it appears to us that the project at issue here is distinguishable because Sunrise is seeking to construct a building that would also house another entity, the church, that would serve a separate public need.

Board's conclusions—once public good flexibility is taken into account[14]—were improper. Because the Board validly concluded that the church and Sunrise's institutional needs were an exceptional condition (with the benefit of public good flexibility), the Board's conclusions regarding practical difficulties follow easily. Its analysis of the practical difficulties connected each of the requested variances to the "economic viability" of the partnership between the church and Sunrise. Even without public good flexibility, the economic burden an applicant faces can qualify as a practical difficulty where the applicant would face a "significant limitation on the utility of the structure" without a variance, if properly connected to the identified exceptional conditions. *Gilmartin*, 579 A.2d at 1171; *cf. Fleischman*, 27 A.3d at 562-63 (explaining in the context of a standard variance application that applicants do not have "to defend every economic aspect of its proposed development design"). The Board applied the proper legal framework and its conclusions followed from its findings: it concluded that the number of stories and lot occupancy were necessary to fit in the minimum number of units to make the project economically viable, and the irregular shape made the side yard variation necessary to provide sufficient

---

[14] Given that we assume without deciding that the Board erred in concluding that the shape with multiple frontages, size, and location of the lot created an "exceptional condition" that satisfied the first step of the variance test, see *supra* Section IV.B.2, we need not consider whether the Board made adequate findings linking that exceptional condition to the practical difficulties it identified.

buffer for surrounding residents around a building of the proposed size. We therefore affirm the Board's decision regarding practical difficulties as well.

## V.    Conclusion

The judgment of the Board is affirmed.

*So ordered.*